## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SPECIAL SITUATIONS FUND III, L.P., SPECIAL SITUATIONS CAYMAN FUND, L.P., and SPECIAL SITUATINOS FUND III QP, L.P., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN DENTAL PARTNERS, INC., GREGORY A. SERRAO, BREHT T. FEIGH, and MARK W. VARGO, <br><br> Defendants. | Civil Action No. <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

### O'BRIEN & WHITE, P. C.
Mark A. White BBO #525520
50 Congress Street, Suite 936
Boston, MA 02109
617-248-2345

### LOWENSTEIN SANDLER PC
Lawrence M. Rolnick (LR-0546)
Marc B. Kramer (MK-8473)
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

SUMMARY OF ALLEGATIONS .......................................................................................2

JURISDICTION AND VENUE ...........................................................................................6

PARTIES ..............................................................................................................................6

FACTUAL ALLEGATIONS ...............................................................................................8

I.      THE FOUNDING OF ADPI AND ADPI'S BUSINESS MODEL....................................8

II.     ADPI AFFILIATES WITH PARK DENTAL IN 1996 ......................................................9

III.    KEY TERMS OF THE SERVICE AGREEMENT BETWEEN PDHC
        AND PDG.....................................................................................................................11

IV.     THE 2001 AMENDMENT TO THE SERVICE AGREEMENT .....................................13

V.      ADPI CONFRONTS DECLINING PROFITABILITY AND GROWTH.........................14

VI.     TO ADDRESS INVESTORS' EARNINGS CONCERNS, ADPI
        EMBARKS ON A MULTI-FACETED FRAUD BY MANIPULATING
        THE PROFITS DERIVED FROM ITS RELATIONSHIP WITH PDG...........................15

        A.      In Order To Meet Its Earnings Targets, ADPI Siphons To Itself
                Money That Was Due To PDG Under The Service Agreement............................16

        B.      In Order To Meet Its Earnings Targets, ADPI Wrongfully Usurps
                Control Of The Park Dental Business And Rams Through Cost-
                Cutting And Other Initiatives.............................................................................20

VII.    PDG COMMENCES A LAWSUIT AGAINST PDHC AND ADP .................................23

VIII.   FACED WITH THE POTENTIAL LOSS OF THE SERVICE
        AGREEMENT, THE DEFENDANTS CONTINUE TO MISLEAD
        INVESTORS AS TO THE STEPS BEING TAKEN TO RESOLVE THE
        DISPUTE.......................................................................................................................26

DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE
CLASS PERIOD.................................................................................................................31

THE TRUTH BEGINS TO EMERGE—ADPI'S DECEPTION IS REVEALED .......................54

LOSS CAUSATION............................................................................................................55

ADDITIONAL ALLEGATIONS OF SCIENTER..........................................................................57

APPLICABILITY OF THE FRAUD-ON-THE-MARKET DOCTRINE.......................................64

INAPPLICABILITY OF STATUTORY SAFE HARBOR .............................................................65

    COUNT I VIOLATION OF SECTION 10(b) OF THE
    EXCHANGE ACT AND RULE 10b-5.................................................................................66

    COUNT II VIOLATION OF SECTION 20(a) OF THE
    EXCHANGE ACT BY THE INDIVIDUAL DEFENDANTS ............................67

    COUNT III VIOLATION OF SECTION 18 OF THE
    EXCHANGE ACT ................................................................................................................68

PRAYER FOR RELIEF ..............................................................................................................70

JURY DEMAND..........................................................................................................................70

## INTRODUCTION

1.     This is a class-actions opt-out complaint filed by one of the largest outside shareholders of American Dental Partners, Inc. ("ADPI" or "the Company") against the Company for violations of the federal securities laws.  Over the period in question, plaintiffs purchased over 500,000 shares of ADPI common stock at average prices of over $19 per share for an investment of more than $10 million on just two days -- December 12 and 12, 2007 -- the value of ADPI's common stock fell from $19.7 to $4.62 and plaintiffs suffered a market loss of over $7 million.  As a result, this action is brought by Special Situations Fund III, L.P., Special Situations Cayman Fund, L.P. and Special Situations Fund III Q.P., L.P. ("Plaintiffs" or "SSF") purchasers of the common stock of American Dental Partners, Inc. ("ADPI" or the "Company").  This action is brought against Defendants ADPI, Gregory A. Serrao ("Serrao"), Breht T. Feigh ("Feigh") and Mark W. Vargo ("Vargo") (collectively, the "Defendants") for violations of Sections 10(b), 20(a) and 18 of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     The allegations in this Complaint are based upon information and belief, except as to allegations specifically pertaining to Plaintiffs and its counsel, which are based on personal knowledge.  Plaintiffs base their belief upon information uncovered through an investigation conducted by and under the supervision of Plaintiffs' attorneys into the facts and circumstances alleged herein, including, without limitation: (a) review and analysis of testimony and documents from the lawsuit captioned *PDG, P.A. and Dental Specialists of Minnesota v. PDHC, Ltd., and American Dental Partners*, No. 27-CV-06-2500 in the Fourth Judicial District Court, County of Hennepin, Minnesota (the "PDG Lawsuit"), including transcripts of the sworn deposition and trial testimony of numerous witnesses including Defendant Serrao; (b) review and analysis of certain filings made by ADPI with the Securities and Exchange Commission ("SEC"); (c) review and analysis of reports of securities analysts and investor advisory services concerning ADPI and/or related parties; (d) review and analysis of transcripts of ADPI's press conferences and

analyst and investor conference calls; (e) review and analysis of publicly available press releases, published interviews, news articles, and other media reports disseminated by or concerning the Defendants and/or related parties and (f) review and analysis of the documents from the lawsuit captioned *In Re American Dental Partners, Inc. Securities Litigation*, No. 08-CV-10119-RGS in the United States District Court for the District of Massachusetts. Except as alleged herein, the underlying information relating to Defendants' misconduct and the particulars thereof are not available to Plaintiff and the public and lie exclusively within the possession and control of Defendants and other insiders. Plaintiffs believe that further substantial evidentiary support exists for the allegations set forth below that will become available after a reasonable opportunity for discovery.

## SUMMARY OF ALLEGATIONS

3. In 1995, Defendant Serrao established ADPI as a "management service organization." In the healthcare context, management service organizations provide management and administrative support services to individual physicians or small group practices, so that the physicians can be relieved of non-medical business functions and can concentrate on the clinical aspects of their practice. ADPI's business objective was to cater to dental group practices. Under the ADPI business model, ADPI would "affiliate" with successful dental group practices in high population growth areas around the country by entering into service agreements with these dental groups.

4. As part of each affiliation, ADPI would acquire all the assets of the affiliated dental group, including all the real property and leases of the clinics out of which the affiliated group practiced. ADP would be responsible for hiring all the administrative and managerial staff to staff the clinics. The dental practitioners would remain employed by their own professional organizations (the affiliated dental groups), and would retain control and direction over all aspects of the practice of dentistry. In return for providing its management and administrative services, ADPI would be reimbursed for all expenditures incurred on behalf of the affiliated

dental group, and would receive a substantial management service fee as well as a performance fee. These amounts would be paid to ADPI from the patient revenues generated by the dentists. The dentists, too, would be paid a percentage of the patient revenues. Any residual profits would then be divided between the affiliated dental group and ADPI according to an agreed formula. As a result, ADPI's success depended largely on the success of its affiliated dental groups.

5.       In 1996, ADPI entered into its very first affiliation, with a professional association of dentists called PDG, P.A. ("PDG"). PDG practiced dentistry in the Minneapolis-St Paul region of Minnesota under the business name "Park Dental." ADPI arranged for a wholly-owned subsidiary of ADPI, PDHC, Ltd. ("PDHC"), to provide the management services to PDG. On November 12, 1996, PDHC entered into a 40-year service agreement with PDG. This agreement was amended and restated on January 1, 1999, and further amended on January 1, 2001 and August 10, 2005. (The agreement and its amendments are collectively referred to herein as the "Service Agreement.")

6.       In the first several years of ADPI's existence, the PDG affiliation was ADPI's most important relationship, accounting for in excess of 50% of ADPI's revenues. It also proved to be an enormous success. Based on the knowledge and expertise ADPI gained from this first affiliation, ADPI was able to replicate the model around the nation. Indeed, ADPI's business was so successful that, in 1998, riding its financial success, ADPI conducted an initial public offering of its stock and raised $38.8 million. Even after entering into new affiliations with other dental groups around the country, the PDG affiliation continued to be ADPI's most significant source of revenues and earnings. According to ADPI's 2006 annual report, ADPI's business relationship with PDG represented approximately 32%, 31% and 29% of ADPI's net revenues for 2004, 2005 and 2006 respectively.

7.       In 2001, however, ADPI's growth began to slow. Due to competition, regulatory issues and other headwinds, ADPI was unable to maintain the heady growth rates of its early years. In addition, ADPI was facing pressure on its profit margins, as its affiliated dental groups sought a greater percentage of the patient revenues. In the first half of 2001, three of ADPI's

affiliated dental groups also faced the loss of patients due to the termination of contracts with certain dental insurers, and the events of September 11, 2001 further exacerbated ADPI's financial difficulties. The result was that by December 2001, ADPI's stock had dropped to just $4.45 per share ($2.97 when adjusted for a 3-for-2 share split on October 17, 2005), after having closed at $17.50 ($11.67 when adjusted for the stock split) on the first day of public trading.

8.     To address ADPI's dismal business performance and its rapidly deflating share price, the Defendants decided to mislead investors. Specifically, the Defendants began to inflate ADPI's reported financial numbers by causing ADPI's wholly-owned subsidiary, PDHC, to siphon money from PDG, ADPI's largest and therefore potentially most susceptible customer. Beginning in 2002, ADPI caused PDHC to divert money to ADPI by underpaying PDG various sums that were due to PDG under the Service Agreement. In addition, ADPI began to usurp control of the Park Dental practice and to cut the dentists out of the decision-making, so that PDHC could ram through cost-cutting and other measures in order to save money. At all times, the Defendants knew that these actions were in breach of the Service Agreement. Regardless of this fact, Defendant Serrao directed and participated in many of these actions. As a result of these wrongful actions, ADPI was able to report inflated earnings growth and artificially boost its share price. ADPI's share price rose steadily from $6.82 ($4.55 on a split-adjusted basis) at the start of 2002 to a high of $34.73 ($23.15 on a split-adjusted basis) in September 2005.

9.     Inevitably, PDG contested the misconduct of PDHC and ADPI under the Service Agreement. In light of the numerous and deliberate breaches of contract by PDHC, PDG filed the PDG Lawsuit on February 3, 2006 alleging, among other causes of action, that PDHC had breached the Service Agreement, breached its fiduciary duty to PDG, and breached an implied covenant of good faith and fair dealing. Upon the public announcement of the filing of this suit on February 6, 2006, ADPI's stock declined from $16.41 per share on February 3, 2006 to $11.49 at the close of trading on February 7, 2006.

10.     Even after the filing of the PDG Lawsuit, Defendants continued to defraud investors. Despite their knowledge that they had breached the Service Agreement and departed

from the practices that were in place at the start of the affiliation relationship, Defendants continued to tell investors that the claims by PDG were "without merit" and "baseless," and that ADPI had not changed its business conduct towards PDG in any way.

11.     Moreover, as the PDG Lawsuit wore on, ADPI decided that it would sever its relationship with PDG and cease to be PDG's management service organization under the Service Agreement. Because it owned the assets of the Park Dental clinics under the Service Agreement, ADPI planned to eject PDG and install a new professional association that would more readily accommodate ADPI's financial objectives. By April 2007, at the latest, ADPI and PDHC began taking steps to implement this plan, including actively recruiting new dentists to staff the Park Dental clinics. This strategic shift in ADPI's business was highly material information for investors, as the Service Agreement with PDG still represented approximately 30% of ADPI's revenues. Despite this, ADPI failed to disclose the information. Indeed, ADPI continued to assure investors of the exact opposite: that it would continue to honor the Service Agreement.

12.     Defendants' fraud, however, was still not complete. After ADPI eventually publicly disclosed that it would cease to be affiliated with PDG as of December 31, 2007, ADPI kept reassuring investors that it had a plan to staff the Park Dental clinics after PDG was ejected. What ADPI failed to inform investors was that the plan was unworkable from the start, and involved further unlawful conduct on the part of ADPI, including ADPI's interference with PDG's attempts to relocate to new clinics by withholding patient records that belonged to PDG and threatening third parties who proposed to deal with the new PDG business.

13.     On December 12 and 13, 2007, after a one-month trial of the PDG Lawsuit, a jury returned two verdicts in favor of PDG. In their verdicts, the jury awarded PDG compensatory and punitive damages totaling a staggering $130 million. The punitive damage verdicts confirmed that ADPI's misconduct toward PDG was intentional and leaves no doubt that ADPI deliberately misled its investors. As a result of this, ADPI's stock price plummeted from $19.70 on December 11, 2007 to close at just $4.62 on December 13, 2007, a loss of more than 75% in

just two days. Investors, including Plaintiff, have collectively lost tens of millions of dollars as a consequence of Defendants' fraud.

## JURISDICTION AND VENUE

14.    The claims asserted in this Complaint arise under and pursuant to Sections 10(b), 18 and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) §78(r) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

15.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, ADPI's principal place of business is located within this Judicial District.

17.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.    Plaintiffs Special Situations Fund III, L.P. Special Situations Fund III QP, L.P., and Special Situations Cayman Fund, L.P. are investment partnerships that purchased shares of ADPI common stock at artificially inflated prices at various times. Plaintiffs purchases of ADPI common stock are set forth in Exhibit A attached hereto. Plaintiffs suffered a substantial loss on its transactions. All of Plaintiffs' purchases were made in reliance upon the public documents filed by ADPI, the misstatements contained within those publically-filed documents, and the public statements made by ADPI and the Individual Defendants.

19.     Defendant ADPI is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 401 Edgewater Place, Suite 430, Wakefield, Massachusetts 01880. At all relevant times, the Company's shares traded on the NASDAQ exchange under the symbol "ADPI."

20.     Defendant Gregory A. Serrao was, at all relevant times, the Chairman, President and Chief Executive Officer ("CEO") of ADPI. Serrao has served on the Board of Directors of ADPI since 1995. During the Class Period, Serrao was a signatory to ADPI's Form 10-Q and Form 10-K filings with the SEC.

21.     Defendant Breht T. Feigh was, at all relevant times, Executive Vice President, Chief Financial Officer and Treasurer of ADPI. During the Class Period, Feigh was a signatory to ADPI's Form 10-Q and Form 10-K filings with the SEC.

22.     Defendant Mark W. Vargo was, at all relevant times, Vice President and Chief Accounting Officer of ADPI. During the Class Period, Vargo was a signatory to ADPI's Form 10-Q and Form 10-K filings with the SEC.

23.     Defendants Serrao, Feigh and Vargo are referred to collectively herein as the "Individual Defendants." It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged in this Complaint, was the result of the collective actions of the Individual Defendants. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company, its business, operations, finances, and financial condition. The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged in this Complaint; knew, or with extreme recklessness, disregarded the fact that materially false and

misleading statements were being issued regarding the Company; and approved or ratified these statements, in violation of securities laws.

## FACTUAL ALLEGATIONS

### I.    THE FOUNDING OF ADPI AND ADPI'S BUSINESS MODEL

24.    ADPI was founded in 1995 by Defendant Serrao with just $100,000 of his own capital and an additional $30 million in debt financing obtained from a private equity investor.

25.    ADPI was established to take advantage of a growing trend in the United States towards dentists practicing in group practices, rather than in solo or two-person practices. As ADPI explained in its 2006 Form 10-K, "a greater percentage of dentists will practice as partners or associates in group dental practices rather than practicing as a solo practitioner as a result of high educational debt levels and a change in gender profile of graduating dentists." ADPI also recognized that, because of the increased complexity of managing and operating dental practices, there was an opportunity for management service organizations such as ADPI to partner with these group practices and provide management expertise and capital support, thereby allowing the dentists to focus on the clinical aspects of dentistry. In its 2006 Form 10-K, ADPI stated:

> [C]urrent market trends in health care are increasing the complexity of operating a dental group practice. In addition, the principals of many dental group practices are reaching retirement age and are beginning to investigate means for transitioning the non-clinical leadership and management of their dental group practices. Consequently, many are engaging professional consultants to assist with these complexities and challenges, and in certain instances are choosing to affiliate with dental management service organizations that can manage the non-clinical aspects of dentistry and provide the necessary organizational structure, resources and capital for continued growth and success.

26.    Using this model, ADPI proclaimed that its business objective was to be the leading business partner to dental group practices in selected markets throughout the United States.

27.    In order to achieve its business objective, ADPI "affiliated" with dental group practices by entering into service agreements with these practices. Under this affiliation model,

the dentists remain employed by the affiliated dental group, continue to perform and supervise all clinical activities, and otherwise retain sole and complete discretion over all aspects of clinical decision-making. For its part, ADPI manages the non-clinical, administrative and business aspects of the affiliated practice. For example, ADPI enters into leases with third parties for the dental facilities out of which the affiliated practices operate. ADPI employs the hygienists, dental assistants and administrative staff at each dental facility. ADPI also employs a "practice manager" at each dental facility who, along with the administrative staff, oversees the day-to-day business operations of the facility, such as staffing, patient scheduling, patient billing, and ordering office and dental supplies. In addition, ADPI provides the affiliated practice with other services such as organizational planning and development; recruiting, retention and training programs; quality assurance initiatives; facilities development and management; employee benefits administration; information systems; marketing and payor relations; and financial planning, reporting and analysis.

## II.    ADPI AFFILIATES WITH PARK DENTAL IN 1996

28.    Prior to 1996, PDHC, Ltd. ("Old PDHC") was a Minnesota professional association owned by, among other persons, Dr. Gregory Swenson ("Dr. Swenson") and various dentist shareholders. Dr. Swenson founded Old PDHC in the 1970s and was a director and President of Old PDHC. For many years, Old PDHC owned and managed dental practices in the Minneapolis-St. Paul area, conducting business under the name "Park Dental."

29.    In approximately 1995, Old PDHC began to explore options for obtaining capital to further its expansion as well as to improve its existing clinics. Dr. Swenson began negotiations with ADPI and Defendant Serrao. The parties explored the idea of selling Old PDHC to ADPI, so that ADPI would own all the assets of Old PDHC and then manage the Park Dental practice, allowing the dentist shareholders of Old PDHC to focus on clinical work.

30.    On November 11, 1996, ADPI entered into an Acquisition and Merger Agreement with Old PDHC, Dr. Swenson and the other dentist shareholders. Under this agreement, ADPI

acquired all the stock and most of the assets of Old PDHC, including dental facilities and the name "Park Dental." In return, the shareholders of Old PDHC received $3.3 million in cash, subordinated promissory notes in the principal amount of $1.5 million, and 210,000 shares of ADPI stock. Upon consummation of the purchase, Old PDHC was converted from a professional association into a business corporation and became a wholly-owned subsidiary of ADPI, that is, the current PDHC.

31.     Immediately upon the sale of their stock in Old PDHC, a number of the former dentist shareholders of Old PDHC formed a new professional association, the current PDG. PDG then entered into a 40-year service agreement with PDHC. This service agreement was subsequently amended and restated on January 1, 1999 as the Service Agreement. Under the Service Agreement, PDHC agreed to act as the management service organization on behalf of PDG. In order to ensure that ADPI would retain the benefit of the experience and leadership of the PDG dentists, Dr. Swenson was appointed to the boards of both PDHC and ADPI, in addition to being a member of PDG.

32.     The acquisition of Old PDHC and the execution of the Service Agreement with PDG constituted ADPI's first acquisition and affiliation transaction, and by far its most important. For the first few years of ADPI's existence, the affiliation with PDG accounted for more than 50% of ADPI's revenues. From November 1996 through December 31, 2006, ADPI completed 71 more acquisition and affiliation transactions, largely based on knowledge and expertise it derived from the affiliation with PDG. As of December 31, 2006, ADPI was affiliated with 22 dental group practices, comprising 470 full-time equivalent dentists practicing in 209 dental facilities in 18 states.

33.     ADPI's business model proved so successful that, on April 16, 1998, ADPI successfully completed an initial public offering in which the Company sold 2,587,500 shares of common stock to the public at $15.00 per share. ADPI's share price quickly rose, closing at $17.50 on the first day of trading ($11.67 when adjusted for the October 2005 stock split).

34.    Even after ADPI's subsequent affiliations with other dental groups, the PDG affiliation continued to be ADPI's most important. As ADPI disclosed in its 2006 Form 10-K, net revenue derived from the Service Agreement with PDG represented approximately 32%, 31% and 29% of ADPI's consolidated net revenue for 2004, 2005 and 2006 respectively.

## III.    KEY TERMS OF THE SERVICE AGREEMENT BETWEEN PDHC AND PDG

35.    Under the Service Agreement, PDHC was appointed the sole and exclusive provider of management services for PDG. In this capacity, PDHC undertook to lease, acquire or otherwise procure clinic facilities for the Park Dental practice. PDHC undertook responsibility for hiring and recruiting all non-dental personnel, including dental assistants, hygienists, and all management, administrative and clerical staff. PDHC agreed to provide PDG with access to all needed working capital and to make approved capital expenditures. PDHC agreed to provide all non-dental equipment, fixtures, office supplies and furniture, reasonably necessary for the operation of each clinic. Subject to the final selection of PDG, PDHC also agreed to provide or finance all dental-related equipment reasonably required by PDG. PDHC was responsible for procuring supplies and for arranging laboratory services, and agreed to establish and implement procedures for quality assurance. PDHC further agreed to establish, maintain and implement credit, billing and collection policies and procedures.

36.    In return for these services, PDHC was to receive various payments under the Service Agreement. In the first instance, the Service Agreement provided that PDHC would be reimbursed for all of the above-described expenditures, defined as "Clinic Expenses,' that ADPI incurred on behalf of PDG in order to operate the Park Dental clinics. In addition, PDHC would be paid an annual fee, called the "Service Fee." For 1999, the first year under the amended and restated Service Agreement, the Service Fee was $8,037,364. Finally, PDHC would be paid a "Performance Fee" representing, effectively, a share in the residual profit after payment of all Clinic Expenses, the Service Fee, and the amounts due to PDG under the Service Agreement

(described immediately below). This residual profit was called the "Contribution Margin" and was allocated between PDHC and PDG according to a formula.

37.     For its part, PDG agreed to employ at its own expense as many dentists as were necessary and appropriate, in PDG's sole discretion, to provide dental care at the Park Dental clinics. In this sense, PDG generated all the patient revenues of the practice. To compensate PDG's dentists for earning these revenues, PDG was to receive a specified portion of the revenues, called the "Provider Expense." In 1999, the Provider Expense was set at 23.6% of the revenues generated by PDG. PDG was then responsible for allocating this Provider Expense among its own dentists in the form of salaries and benefits, and for payment of professional dues, continuing education and other direct costs related to employment of the dentists. Like PDHC, PDG was entitled to an additional allocation of the Contribution Margin.

38.     In this fashion, the Service Agreement set forth a methodology for distributing the revenues generated by the Park Dental practice. This distribution was to be effected according to a pre-determined priority of payments. Under Section 4.12 of the Service Agreement, the patient revenues generated by PDG from the Park Dental clinics were first to be used to reimburse PDHC for all incurred Clinic Expenses. PDHC would then be paid its Service Fee. After that, PDG would be paid its Provider Expense. And, finally, the Contribution Margin would be divided between PDHC and PDG.

39.     Apart from detailing the financial arrangements between PDG and PDHC, the Service Agreement contained provisions setting forth the relative division of powers between the parties. These were not idle provisions, but were designed specifically to ensure that the Service Agreement complied fully with state regulations prohibiting the practice of dentistry by persons not licensed to do so. Thus, Section 9.1 provided that:

> Nothing in this agreement is intended or shall be construed to allow [PDHC] to exercise control or direction over the manner or method by which [PDG] and its dentists perform Dental Care or other professional dental care services. The rendition of all Dental Care shall be the sole responsibility of [PDG] and its dentists, and [PDHC] shall not interfere in any manner or to any extent

therewith. Nothing contained in this agreement shall be construed to permit [PDHC] to engage in the practice of dentistry, it being the sole intention of the Parties hereto that the services to be rendered to [PDG] by [PDHC] are solely for the purpose of providing non-dental administrative services to [PDG] so as to enable [PDG] to devote its full time and energies to the professional conduct of its dental practice and provision of Dental Care to its patients and not to administration, or practice management.

40.     To facilitate effective joint decision-making by PDHC and PDG on significant matters affecting the Park Dental clinics, Section 3.1 of the Service Agreement created a "Policy Board" which was to be responsible for "developing and implementing management and administrative policies for the overall operation of the [Park Dental] [c]linics." Among the specific responsibilities and duties assigned to the Policy Board were review and approval of: the annual budget; all capital improvements; marketing and advertising; patient fees and collections policies; and long term strategic and short term operational goals. The Policy Board was created with eight members, four of whom were designated by PDG, and four by PDHC.

## IV.    THE 2001 AMENDMENT TO THE SERVICE AGREEMENT

41.     On January 1, 2001, PDHC and PDG entered into an amendment of the Service Agreement (the "First Amendment"). Under the First Amendment, PDHC and PDG agreed to a new methodology for calculating the Provider Expense to be paid to PDG from the patient revenues generated by PDG. Under the new formula, the parties would first agree to a budget. Under this budget, PDHC and PDG would agree to an amount to pay the dentists' compensation, benefits and other expenses such as license fees and dues. This amount was called the "Base Provider Expense." Then, an amount equal to 1% of revenues would be added to the Base Provider Expense. Finally, an amount partly going towards the dentists' deferred compensation plan would be added. The sum of these three amounts would then be divided by the total revenue generated by PDG to arrive at the "Provider Expense Percentage." This percentage would then be applied to the revenues generated by PDG to determine the amount that was to be paid to PDG.

42.     The First Amendment was intended to address the fact that the PDG dentists had historically been underpaid. To remedy this, PDHC and PDG agreed to a "catch-up" in 2001 by giving the dentists an additional one percent of the revenues, as reflected in the second component of the Provider Expense percentage under the new formula described above. PDHC and PDG agreed to carry this arrangement forward into future years.

## V.     ADPI CONFRONTS DECLINING PROFITABILITY AND GROWTH

43.     Commencing in 2001, ADPI encountered significant headwinds in its business. In January 2001, three of the Company's affiliated dental groups—Park Dental, Associated Dental Care Providers, and University Dental Associates—received notices of contract terminations from Cigna Dental, a provider of dental benefits plans. Associated Dental Care Providers received an additional notice of contract termination from Protective Life Corporation, another provider of dental benefits plans. As disclosed by ADPI, the three affiliated dental groups in question received proposals for new dental insurance plans from Cigna Dental and Protective Life Corporation that were on significantly less favorable financial terms compared to their existing agreements. Accordingly, the three affiliated groups chose not to continue as participants in the dental plans offered by Cigna Dental and Protective Life Corporation.

44.     The four contract terminations by Cigna Dental and Protective Life Corporation in 2001 had a significant impact on the financial performance of ADPI. According to ADPI's 2002 Form 10-K, the loss of the four contracts represented a loss of approximately $24.1 million of the gross revenues generated by ADPI's affiliated dental practices, based on 2000 figures.

45.     Apart from the contract terminations with these dental benefits providers, ADPI was generally experiencing slower growth in the number and size of new affiliations due to greater competition, regulatory issues and other reasons. Combined with the effects of the four contract terminations, the result was that, after growing total patient revenues at its affiliated practices by 44% in 1999 and 28% during 2000, revenue growth slowed to just 7% in 2001 and

4% in 2002. This, in turn, directly affected the revenues ADPI earned from its service agreements with its affiliated practices.

46.     Not only did revenue growth begin to suffer, but ADPI's profit margins also came under pressure. While ADPI's EBITDA (earnings before interest, taxes, depreciation and amortization) margin peaked during 1999 at 11.92% of total revenue, EBITDA margins declined to 11.66% of total revenue in 2000, fell sharply to 9.18% in 2001, and fell to a low of 8.12% in 2002. According to witnesses who testified in the PDG Lawsuit, all of these problems were exacerbated by the events of September 2001.

47.     Due to all of these financial pressures, on June 28, 2001, shares of ADPI closed at just $2.67 on a split-adjusted basis. ADPI's stock price re-tested these lows later in 2001, closing at $2.97 on December 18, 2001.

## VI.    TO ADDRESS INVESTORS' EARNINGS CONCERNS, ADPI EMBARKS ON A MULTI-FACETED FRAUD BY MANIPULATING THE PROFITS DERIVED FROM ITS RELATIONSHIP WITH PDG

48.     In the face of these financial difficulties, and under pressure from its investors, ADPI began to take steps in 2002 to restore its weakening share price. According to Dr. John Gulon ("Dr. Gulon"), a member of PDG, in order to meet Wall Street's earnings objectives, Defendant Serrao set an ambitious target for ADPI of a 20% return on its investment in its affiliations with dental groups. As Dr. Gulon testified in the trial of the PDG Lawsuit, Defendant Serrao himself told Dr. Gulon of this internal target.

49.     Under the direction of Serrao, ADPI used its largest management service contract—the Service Agreement between PDHC and PDG which accounted for some 30% of ADPI's earnings—as part of a fraudulent scheme to inflate ADPI's reported earnings. First, in breach of the Service Agreement, ADPI began siphoning to itself money that was due to PDG under the Service Agreement, and then reported this money as profits earned by ADPI, thereby improperly inflating the earnings (and the stock price) of ADPI. Second, ADPI began taking steps to wrongly usurp control of the Park Dental business from PDG's dentists, in breach of the

Service Agreement, with the sole purpose of ramming through cost-cutting and other initiatives that would boost ADPI's earnings from the affiliation relationship with PDG. These two aspects of ADPI's fraud are described in greater detail below.

A.   **In Order To Meet Its Earnings Targets, ADPI Siphons To Itself Money That Was Due To PDG Under The Service Agreement.**

50.   Commencing in 2002, and in breach of the Service Agreement, ADPI collaborated with its subsidiary, PDHC, to secretly siphon money due to PDG under the Service Agreement. ADPI and PDHC accomplished this in various ways.

51.   As already described, the principal component of the PDG dentists' remuneration under the Service Agreement was the Provider Expense. As a result of the First Amendment to the Service Agreement that was executed in 2001, the Provider Expense was calculated by applying the Provider Expense percentage to the patient revenues generated by the dentists. Under the First Amendment, the parties explicitly agreed to include an additional 1% of patient revenues in the Provider Expense percentage in order to compensate the PDG dentists for prior underpayments. However, as PDG's damages expert, Greg Hirsch ("Hirsch"), testified in the trial of the PDG Lawsuit, from 2002 through 2007, ADPI and PDHC calculated the Provider Expense percentage incorrectly by, among other things, omitting the agreed-upon additional 1%. Thus, in 2002, under the methodology set forth in the First Amendment, the correct Provider Expense percentage should have been 27.1 percent. Instead, PDG was only paid 25.5 percent, resulting in an underpayment to PDG of $1,049,000. In 2007, the underpayment was even larger, amounting to $2,147,000. In total, Hirsch calculated that, between 2002 and 2007, PDG was underpaid by a net amount of $9,003,277. Because it was underpaying PDG, ADPI was able to inflate its reported revenues and earnings during those years by the same amount.

52.   ADPI and PDHC also siphoned money that was due to PDG as part of its Provider Expense in another way. Under the Service Agreement, budgets determining the Provider Expense and the other financial items to be paid to the respective parties were to be negotiated in the prior year. However, because of the lengthy negotiation process, a budget

would usually not be completed until well into the year to which the budget related. Under a practice that developed over the years, the parties agreed to make budgets, once agreed upon, retroactive to the start of the year. In 2005, however, ADPI and PDHC refused to make the 2005 budget retroactive to January 1, 2005. According to Michael Kenneally ("Kenneally"), the CEO of PDHC who also became a Senior Vice President of ADPI in February 2005, this was a decision that came directly from Defendant Serrao. Similarly, ADPI and PDHC did not make the budget retroactive in 2006 and 2007. The result was that, in 2005, PDG was underpaid by $209,000 in Provider Expense and $430,000 in profit sharing (PDG's share of the Contribution Margin), a total of $640,000. In 2006, PDG was underpaid $220,000 in Provider Expense and $580,000 in profit sharing, a total of $800,447. And in 2007, PDG was underpaid $227,000 in Provider Expense and $434,000 in profit sharing, a total of $662,000. Thus, between 2005 and 2007, PDHC siphoned a total of $2,102,706 from PDG, which ADPI reported as part of its earnings.

53.     A further way by which ADPI and PDHC siphoned money from PDG was to manipulate the amount of the Contribution Margin. As described above, the Contribution Margin was the residual profit after patient revenues were used to pay the Clinic Expenses, the Service Fee due to PDHC, and the Provider Expense. PDG was entitled to a proportion of the Contribution Margin. Under the Service Agreement, the amount of the Clinic Expenses was supposed to be budgeted in advance, and this budgeted amount was then to be used to calculate the Contribution Margin. That way, if PDHC spent more than budgeted on Clinic Expenses in a given year in the course of performing its services under the Service Agreement, PDHC would only be reimbursed the budgeted amount, and it would have to bear the excess expenditure itself. PDG would not be penalized for PDHC's over-expenditure because the lower, budgeted amount would still be used to calculate the Contribution Margin and, thus, PDG's share of this Contribution Margin.

54.     Under a practice that had developed in the prior years, if a budget had not been approved for the upcoming year, the most recently approved budget would roll forward. Each of

the Individual Defendants knew this was the practice. During ADPI's 2005 second quarter

conference call with investors on July 28, 2005, Defendant Serrao described the Service

Agreement in the following manner to investors:

> [W]e do have an agreement in place. We have had an agreement in
> place because our service agreement rolls over from year-to-year.
> So unless we reach a new agreement, we just stay on the
> agreement that is in place from the prior year. So I think what we
> hope we have done is reached a resolution on a revision for '05
> that will be acceptable to everybody and good for American Dental
> Partners.

Both Defendants Vargo and Feigh also participated in this conference call. Defendant Serrao

repeated this characterization of the budgeting process during the 2005 third quarter conference

call with investors on October 27, 2005. Again, both Defendants Vargo and Feigh participated in

that conference call.

     55.    In the first half of 2005, a budget was not in place for the Clinic Expenses. So,

under the past practice, the previously approved Clinic Expenses budget of $21,183,000 for 2004

should have been used for the first six months of 2005 to calculate the Contribution Margin.

Instead, however, PDHC and APDI used the actual Clinic Expenses for the first six months of

2005, an amount of $23,031,000, to calculate the Contribution Margin. ADPI and PDHC

therefore shifted the approximately $1,848,000 excess in Clinical Expenses directly on to PDG,

by reducing the Contribution Margin available to be distributed to PDG. According to Hirsch,

PDG's damages expert in the PDG Lawsuit, the result was that, in 2005, ADPI and PDHC paid

themselves an additional approximately $1,848,000 for reimbursement of their Clinic Expenses,

while diverting approximately $739,000 in Contribution Margin from PDG. In similar fashion, in

2006 and 2007, ADPI and PDHC improperly failed to roll over the previous year's Clinic

Expenses budget as they were required to do, thereby diverting the additional sums of

$1,244,254 and $1,338,462, respectively, in Contribution Margin from PDG. In total, between

2005 and 2007, APDI and PDHC diverted a total of $3,321,743 from PDG in this manner. By

diverting to itself Contribution Margin that was properly due to PDG, ADPI inflated its reported revenues and earnings.

56.     ADPI and PDHC siphoned money from PDG in yet other ways. For example, all patient revenues generated by the Park Dental clinics were deposited into a bank account owned by and maintained in the name of PDG. These funds were then supposed to be swept out of PDG's account into an ADPI bank account held in Massachusetts. Although the Service Agreement provided that the Clinic Expenses and Service Fee were supposed to be paid monthly to PDHC, and the Performance Fee paid quarterly, PDHC swept the moneys maintained in PDG's bank account into ADPI's Massachusetts account on a daily basis. In the trial of the PDG Lawsuit, David Nelsen, the controller of PDHC, testified that Defendant Feigh continually instructed the accounting staff of PDHC to sweep money from the PDG account into the ADPI account. Feigh reminded the accounting staff of this on a quarterly basis. In one email, Feigh reminded the accounting staff that sweeping the money into PDHC's account would allow ADPI to "continue [its] four-year run of improving cash flow from operations...." The result of these actions was to cost PDG the interest that would have been earned on these funds. According to Hirsch, ADPI and PDHC diverted a total of $522,254 from PDG in this manner.

57.     PDHC and ADPI also failed to account to PDG for the value of dental services provided to PDHC employees and family members pursuant to the PDHC dental plan, thereby depriving PDG of an additional $369,667. Unbeknownst to PDG, ADPI and PDHC also improperly charged a number of expenses, including fees paid to their outside legal counsel, Baker & Hostetler, as Clinical Expense. And, finally, PDHC failed to pass on to PDG rebates that were received from vendors for the purchase of equipment and supplies.

58.     In all of these respects, ADPI and PDHC improperly diverted to themselves millions of dollars that were due to PDG under the Service Agreement. ADPI then fraudulently incorporated the diverted money as part of ADPI's reported earnings, thereby inflating its share price. At no stage did ADPI disclose to its investors that a large part of ADPI's reported earnings

were derived from knowing breaches of contract on the part of APDI under the Service Agreement.

**B.   In Order To Meet Its Earnings Targets, ADPI Wrongfully Usurps Control Of The Park Dental Business And Rams Through Cost-Cutting And Other Initiatives.**

59.     Commencing in 2003, in breach of the Service Agreement, ADPI and PDHC took steps to wrest control of the Park Dental business from PDG. ADPI's purpose was to take control of the Park Dental business so that it could impose cost-cutting and other initiatives which would improve the appearance of ADPI's earnings and performance. Defendants knew that this would create a misleading picture of its financial performance because, at all material times, they knew that the steps ADPI was taking were in breach of the Service Agreement, and were therefore unsustainable in the long run.

60.     In 2003, ADPI introduced a policy for organizing and managing employees, called "Healthy Organization," across all of ADPI's affiliated dental practice groups around the country. Serrao personally developed the Healthy Organization policy purportedly to foster a uniform culture of leadership and initiative among ADPI's employees across the various affiliated practices. Although the Service Agreement required that this new management policy be approved by the entire Policy Board before being introduced to the Park Dental clinics, ADPI and PDHC introduced Healthy Organization without putting the policy to a vote of the Policy Board and over the PDG dentists' express objections.

61.     Under the guise of this Healthy Organization policy, Serrao began instructing ADPI's employees at the Park Dental clinics, particularly the practice managers, not to take directions from the PDG dentists, even though the Service Agreement clearly required all aspects of clinical practice to be supervised and directed by the PDG dentists. In breach of its obligations to PDG under the Service Agreement, Defendant Serrao personally began to foment dissatisfaction amongst the Park Dental dentists against PDG, with the intent of toppling PDG's leadership and installing new leaders at PDG who would be more closely aligned with the

interests of ADPI. Defendant Serrao also sought to create discord amongst the non-clinical staff at Park Dental.

62.     For example, in the fall of 2004, Defendant Serrao made many unannounced visits to Park Dental clinics, during which he openly disparaged PDG's leadership. Despite the requests of PDG that he cease his visits because they constituted a breach of the Service Agreement, Defendant Serrao continued to make his trips. On May 4, 2005, Defendant Serrao made a presentation to PDG non-clinical staff at Park Dental's Edina clinic, during which he disparaged the PDG members on the joint Policy Board as too old, ineffective, and resistant to the implementation of Healthy Organization. Defendant Serrao accused PDG leadership of being overpaid and hoarding the bulk of the revenues generated by PDG. According to notes of the meeting taken by Dr. Gulon, Defendant Serrao invoked Healthy Organization and exhorted the practice managers to "have the courage to stand up to the doctors." In breach of ADPI's confidentiality and fiduciary obligations to PDG under the Service Agreement, Defendant Serrao distributed an information packet to the participants at the meeting that contained information about compensation and financial data for Park Dental that was intended to breed discontent among the attendees. On May 18, 2005, Defendant Serrao commenced a letter-writing campaign to PDG's dentists. In his letters, Serrao attempted to lay out the state of affairs at Park Dental, as ADPI viewed it, and to further undermine the position taken by PDG. And in an email dated August 5, 2005 and subsequent emails, Defendant Serrao instructed that financial information concerning the compensation of PDG's leadership be distributed to select dentists in order to generate further dissent.

63.     Through these and other steps, ADPI and PDHC began to assume control of the Park Dental practice, allowing them to implement the Service Agreement in a way that financially favored PDHC and ADPI. In particular, over the objections of PDG's dentists, ADPI and PDHC began to take measures to reduce costs and sacrifice quality of care. As PDHC's CEO, Kenneally, testified at the trial of the PDG Lawsuit, for every dollar that PDHC saved in Clinic Expenses, PDHC kept $0.89, thus generating additional profit for ADPI. Among other

measures, ADPI and PDHC cut critical staff that were required to be paid for by PDHC under the Service Agreement as a Clinic Expense. Thus, PDHC terminated three out of four essential "dental hygiene mentors" who were responsible for educating and training the large number of hygienists employed at the Park Dental clinics and who were thus crucial to patient treatment and clinical care. Over the dentists' objections, PDHC retained the least qualified dental hygiene mentor because she had the lowest salary. PDHC also terminated two sterilization team members at Park Dental's Ridges clinic against the wishes of the dentists. In order to further save money, ADPI and PDHC ran down the amount of inventory and supplies and reduced expenditures on equipment maintenance and repair, in breach of its obligations as the management service organization under the Service Agreement.

64.     At the same time they were cutting back on expenditures PDHC was obligated to make under the Service Agreement, ADPI and PDHC began meddling with the scheduling of patients. Specifically, ADPI and PDHC began focusing on maximizing the number of patients that could be seen (referred to as "utilization") to the detriment of continuity of care. For example, patients were put on the schedule with dentists they had not previously seen, simply because there was room in a particular day's schedule. In many cases, patients who wished to see a particular dentist were deliberately scheduled on a day when that dentist was not working, thereby diverting the patients to days where the utilization could be improved. Another way by which ADPI and PDHC interfered with scheduling in order to improve profitability was to limit the number of certain categories of patients in a particular month. According to her deposition testimony in the PDG Lawsuit, one practice manager employed by ADPI described how she would issue instructions to certain clinics not to take on any more "capitation" (also known as "directed care") patients in a given month once a certain amount of directed care revenue had already been hit for the month. Directed care patients generate less revenue because these patients make fixed payments regardless of the amount of service provided to the patients. The practice manager described how those rejected patients were then rescheduled in the following month.

65.     ADPI and PDHC also eliminated Park Dental's long-standing repayment plan for patients without advising PDG's dentists and without approval of the joint Policy Board. In breach of the Service Agreement, ADPI implemented a new financing plan called *dentalpaymentplan* as the only financing option at Park Dental clinics. Although ADPI trumpeted this plan as "offering patients alternative financing options which makes treatment plans more affordable," in reality, it was another means for PDHC to cut its costs.

66.     In this fashion, under the direction of Defendant Serrao, ADPI and PDHC deliberately usurped control of the Park Dental clinics from PDG, breaching the Service Agreement. APDI then implemented many cost-cutting and other initiatives that were objected to by the PDG dentists and were also in direct breach of the Service Agreement. Through this improper conduct, ADPI was able to boost the reported revenues and earnings derived from the PDG affiliation. However, because ADPI's actions were in breach of the Service Agreement and therefore unsustainable in the long run, ADPI's earnings reports falsely portrayed the profitability of the Park Dental affiliation.

## VII.    PDG COMMENCES A LAWSUIT AGAINST PDHC AND ADP

67.     Due to PDHC's numerous breaches of the Service Agreement, on February 3, 2006, PDG commenced the PDG Lawsuit against PDHC. In its complaint, PDG alleged, among other things, that PDHC had breached the Service Agreement, breached an implied covenant of good faith and fair dealing, breached its fiduciary duty to PDG, and tortiously interfered with PDG's contracts with its dentists. One of the remedies sought by PDG was a declaration that the Service Agreement was void and subject to rescission.

68.     On February 6, 2006, ADPI disclosed to the market that PDG had commenced the PDG Lawsuit against PDHC. In its press release, ADPI stated that it believed "the relationship between PDHC and PDG, including the terms of the Service Agreement, is in compliance with applicable laws.... The Company conducts its business at Park Dental today as it has since entering into the affiliation with PDG nine years ago and intends to continue to do so."

69.     ADPI investors reacted swiftly to these events. After closing at $16.41 per share on February 3, 2006, ADPI's stock price dropped to $13.66 on February 6, 2006, and then to $11.49 at the close of trading on February 7, 2006. Investors' reaction was based on the concern that ADPI could lose its largest management service contract, accounting for approximately 30% of its reported revenues and earnings. As an analyst at the Susquehanna Financial Group reported on April 12, 2006, "ADPI is highly dependent on service agreements with affiliated dental groups for revenue generation. The company's service agreement with Park Dental [] contributed 31% [] to revenue in FY05. Termination of [this] agreement will adversely affect ADPI's business, financial condition, and operating results."

70.     Despite the fact that ADPI knew it had breached the Service Agreement in multiple respects, ADPI repeatedly misled investors by denying the merits of PDG's claims in ADPI's SEC filings, in press releases and during conference calls.

71.     On March 10, 2006, ADPI filed its Form 10-K for the year ended December 31, 2005. In discussing the complaint filed by PDG in the PDG Lawsuit, and PDHC's answer to that complaint, ADPI stated: "PDHC seeks to dismiss the Complaint with prejudice, and recover compensatory damages, interest, and costs and attorneys' fees. PDHC believes the claims made by PDG are baseless ..." In subsequent SEC filings, including ADPI's Form 10-K for the year ended December 31, 2006, and its Forms 10-Q for the quarters ended March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007, and September 30, 2007, ADPI continually asserted that it believed the claims made by PDG to be "baseless" and/or "without merit."

72.     ADPI's press releases were equally misleading. On February 6, 2006, ADPI issued a press release in which it claimed that it had "reviewed the complaint [filed by PDG in the PDG Lawsuit] and believes the allegations are baseless and without merit. The Company further believes that the relationship between PDHC and PDG, including the terms of the Service Agreement, is in compliance with applicable laws." ADPI further misled the investors by asserting that "the Company conducts its business at Park Dental today as it has since entering

into the affiliation with PDG nine years ago and intends to continue to do so." On April 3, 2007, Defendant ADPI issued another press release affirming "the Company's long[-]held belief that the lawsuit brought by PDG is nothing more than PDG attempting to undo a transaction that was fairly negotiated over ten years ago by two well represented parties." ADPI added that, "according to the provisions of the Service Agreement, PDG cannot terminate the agreement unilaterally except in limited circumstances. The Company believes that none of those circumstances apply and that PDG would have significant legal exposure if it attempts to terminate the Service Agreement without first proving in court a material breach of the agreement by PDHC."

73.    ADPI made similar misleading statements during its conference calls with investors. During a conference call with investors on February 23, 2006, Serrao stated that ADPI had reviewed the complaint and "believe[s] the allegations are baseless and without merit. As discussed in our press release, we view this lawsuit as a means to an end, a desire by the directors of PDG to undo a transaction that was fairly negotiated and structured between two parties nearly 10 years ago." Similarly, during another conference call with investors on May 2, 2006, Serrao stated that "the directors of PDG wish to undo a transaction that was fairly negotiated and structured between the parties through a complaint that contains claims that are without merit." Serrao repeated this assertion on a conference call with investors on February 22, 2007. Finally, during a conference call with investors on April 4, 2007, Serrao misled investors by stating that there had been no changes to the way ADPI has executed its obligations under the service agreement and that PDHC had not "breached material provisions of the service agreement and [had] denied such alleged breaches. More importantly, we will continue to operate our Park Dental business consistent with the service agreement and our past practices."

## VIII. FACED WITH THE POTENTIAL LOSS OF THE SERVICE AGREEMENT, THE DEFENDANTS CONTINUE TO MISLEAD INVESTORS AS TO THE STEPS BEING TAKEN TO RESOLVE THE DISPUTE.

74.     On March 28, 2007, while the PDG Lawsuit was pending, and in the face of continued breaches of the Service Agreement by PDHC, PDG signaled a new phase in its dispute with PDHC and ADPI by serving PDHC with a notice of termination of the Service Agreement, effective December 31, 2007 (the "Notice of Termination"). In order to prevent a negative reaction from investors to the potential loss of ADPI's largest affiliation relationship, and to keep ADPI's stock price inflated, the Defendants engaged in a further fraud. Specifically, the Defendants initially reassured investors that ADPI intended to honor the Service Agreement, to contest the Notice of Termination, and to hold PDG bound to the Service Agreement, despite the Notice of Termination. The Defendants gave these assurances even though they had secretly begun taking steps to torpedo the Service Agreement and to sever ADPI's partnership with PDG by, at the latest, April 2007. Then, when Defendants did eventually disclose to investors that ADPI no longer intended to perform under the Service Agreement, the Defendants further misled investors by reassuring them that ADPI had a plan to continue to operate the Park Dental clinics without the need for PDG. This reassurance was misleading because Defendants failed to disclose that the plan involved poaching dentists from PDG, undermining PDG's efforts to establish its own new clinics, and other unlawful conduct. These aspects of the fraud are set forth in greater detail below.

75.     As early as April 2006, two months after the commencement of the PDG Lawsuit by PDG, ADPI and PDHC began looking for facilities to set up a new practice, to be called Assure Dental, to compete against PDG. As PDHC's CEO, Kenneally, testified in the trial of the PDG Lawsuit, he and several PDHC employees were involved in helping to establish Assure Dental. PDHC convinced two PDG dentists to resign from PDG and to start up Assure Dental. In June 2006, ADPI entered into a service agreement with Assure Dental.

76.     In approximately April 2007, PDHC approached Dr. James Ludke ("Ludke"), a Wisconsin dental practitioner, to solicit his interest in forming and heading a new professional

association, to be affiliated with ADPI, in Minnesota. PDHC had previously contacted Ludke to see if he was interested in joining Assure Dental, but that plan had fallen through. This time, PDHC informed Ludke that the new professional association would operate out of the Park Dental clinics, and that PDHC would recruit dentists away from PDG to work for the new professional association. In other words, by April 2007 at the latest, ADPI and PDHC intended to abandon the Service Agreement.

77.     In furtherance of their plan, ADPI and PDHC commenced recruiting PDG's dentists. In approximately May 2007, ADPI and PDHC sent proposed contracts of employment to PDG dentists, offering them a signing bonus of $50,000, an additional $30,000 bonus in year 2, and a $30,000 bonus in year 3. Also, ADPI and PDHC promised the dentists that they would collectively be paid 32% of patient revenues. ADPI and PDHC also offered to indemnify any dentist against liability for breach of the non-compete clauses in their employment contracts with PDG.

78.     On July 3, 2007, ADPI further communicated with PDG dentists to inform them of the opportunity to work for the new professional association to be headed by Ludke. ADPI provided a comparison of the compensation each dentist was currently receiving from PDG to that which the dentist would receive from the new organization. Some of the PDG dentists proceeded to sign with the new organization. On July 16, 2007, the new professional association, Ludke, D.D.S., PLLC ("Ludke PLLC") was formed. On July 17, 2007, Ludke PLLC entered into a "bridge agreement" with PDHC under which PDHC agreed to provide Ludke PLLC with certain funding and to indemnify Ludke PLLC against any liability and expenses.

79.     Despite forming the intention by, at the latest, April 2007 to sever ADPI's affiliation with PDG, and despite taking numerous steps to further that intention, Defendants misled investors by repeatedly reassuring them that, even though PDHC had been served with the Notice of Termination, PDHC would continue to perform under the Service Agreement, and would hold PDG to the Service Agreement. For example, on April 3, 2007, ADPI issued a press release announcing that PDG had served PDHC with the Notice of Termination. In the press

-27-

release, ADPI reiterated its "long held belief that the lawsuit brought by PDG is nothing more than PDG attempting to undo a transaction that was fairly negotiated over ten years ago by two well-represented parties." During a conference call with investors held on April 4, 2007, Defendant Serrao stated defiantly:

> First, we do not believe that PDHC has breached material provisions of the [S]ervice [A]greement, and have denied such alleged breaches. Second, PDG does not have the right to terminate the [S]ervice [A]greement simply because they contend PDHC has breached the agreement. PDG must first prove the alleged breaches prior to terminating the agreement. We have notified PDG that if PDG takes further action to terminate the agreement without first proving in court that PDHC has breached one or more provisions of the agreement that give rise to the right to terminate, then we intend to pursue legal action against PDG for violation of the agreement. And we will seek significant damages arising out of PDG's failure to honor the remaining term of the agreement, which is almost 30 years.

80.     And, subsequently, on June 21, 2007, PDHC commenced a separate lawsuit against PDG, alleging wrongful termination of the Service Agreement.[1] In this manner, ADPI misled investors that ADPI was taking all steps to prevent the loss of the Service Agreement.

81.     Even when the Defendants eventually revealed that ADPI was preparing for the loss of the Service Agreement, and was implementing plans to address that eventuality, Defendants continued to mislead investors in order to control any damage to ADPI's stock price caused by news of the loss of the Service Agreement. On July 31, 2007, during a conference call with investors to discuss ADPI's 2007 second quarter results, Serrao stated:

> [With respect to the Service Agreement], PDG terminated the contract. We've contended all along and we've actually initiated litigation that we think they terminated it wrongfully. But they did terminate it and they've taken actions to act on that termination. They committed to leave the offices on December 31st. So they basically forced us into a position where we've needed to make commitments. We've made commitments. And we expect to be

---

[1] On July 5, 2007, PDHC's separately filed lawsuit against PDG was consolidated with the PDG Lawsuit, and the court ordered that both litigations be tried together. On July 23, 2007, PDG answered the complaint filed by PDHC, and added ADPI as a third-party defendant. PDG asserted, among other things, claims against ADPI for tortuous interference with contract or business expectancy, and for breach of fiduciary duty.

> operating the Park Dental offices with a new professional
> association effective January 1st of 2008.

82. Then, on October 29, 2007, ADPI issued a press release (the "October 29, 2007

Press Release") announcing its 2007 third quarter results. In the October 29, 2007 Press Release,

ADPI confirmed that the Service Agreement could no longer be salvaged and advised investors

that ADPI had made plans to continue operating the Park Dental clinics as of January 1, 2008:

> Based on litigation developments subsequent to September 30,
> 2007, the Company is proceeding on the basis that PDHC, Ltd.
> will no longer provide dental facilities and business services after
> December 31, 2007 to PDG, P.A. pursuant to the Service
> Agreement between the two parties. Accordingly, the Company is
> assessing the potential impairment of the intangible asset
> associated with the Service Agreement between PDHC and PDG.
> ... The Company has entered into a new affiliation with a
> Minnesota professional limited liability company. The Company
> intends to continue to operate its Park Dental business with this
> Minnesota affiliated practice effective January 1, 2008.

83. Defendants' continued reassurances to investors were misleading in several

respects.

84. First, Defendants failed to adequately inform the market that the success of the

new professional association depended on recruiting dentists from PDG and that, up to that point,

ADPI had only had limited success attracting dentists from PDG. In fact, as Ludke testified at the

trial of the PDG Lawsuit, ADPI had only managed to recruit 22 dentists (out of more than 100)

from PDG as of November 26, 2007.

85. Second, Defendants failed to inform investors that the recruitment of dentists

from PDG was fraught with legal and other risk because it involved or would involve multiple,

knowing breaches of the Service Agreement and of fiduciary duty by ADPI and PDHC. Russell

Sullivan ("Sullivan"), the vice-president of human resources at ADPI, spearheaded the recruiting

effort. As Sullivan testified in the trial of the PDG Lawsuit, he met with Defendant Serrao in

early June 2007 to discuss a strategy for recruiting PDG's dentists. Sullivan testified that he kept

Serrao apprised of all developments. At the time they discussed strategy, both he and Serrao

were familiar with the terms of the Service Agreement.

-29-

86.     Despite their familiarity with the terms of the Service Agreement, Sullivan and Serrao authorized ADPI employees to use salary and other information that was confidential to PDG and that had been entrusted to PDHC as the management service organization, for purposes of recruiting PDG's dentists. In fact, Defendant Serrao was actively involved in determining the compensation levels and bonuses necessary to attract the PDG dentists. These actions were clearly in breach of the confidentiality provisions of the Service Agreement as well as PDHC's fiduciary obligations to PDG. Furthermore, Defendants knew that recruiting PDG's dentists to work for a new professional association at the same Park Dental premises would constitute a breach of the non-compete covenants contained in the dentists' employment agreements with PDG. Regardless of this, PDHC offered to indemnify the dentists in case they were sued by PDG. In further breach of PDHC's obligations under the Service Agreement and as a fiduciary to PDG, Sullivan used the Park Dental intranet to disseminate information to PDG dentists and other, non-clinical staff about the recruiting efforts that were underway. In fact, PDHC deliberately spread false information concerning PDG to PDG's dentists. Under the supervision of Sullivan and Serrao, PDHC practice managers circulated statements to the effect that ADPI had sued the PDG dentists for $140 to $180 million; that the "legal battle [was] over" and that PDG had lost; that PDG was "borderline insolvent and financially strapped"; and that the "PDG retirement fund was $1 million underfunded."

87.     Third, Defendants failed to inform investors that, as part of their plan to operate the Park Dental clinics with a new professional association, ADPI and PDHC were unlawfully interfering with PDG's own efforts to relocate to new dental clinics. Among other conduct, ADPI and PDHC refused to comply with PDG's numerous requests to obtain an electronic copy of the dental records for PDG's approximately 280,000 patients, even though the Service Agreement explicitly provided that this information belonged to PDG. At the trial of the PDG Lawsuit, PDHC's CEO, Kenneally, testified that he discussed with Serrao the issue of withholding the patient records, and Defendant Serrao himself testified that he knew the records belonged to PDG.

-30-

88.     Apart from withholding patient records, ADPI and PDHC directly contacted various third parties to discourage them from doing business with any new PDG dental practice. In March 2007, PDG began looking for new dental locations and contacting vendors. Upon learning that PDG had met with a company called Patterson Dental, the Park Dental clinics' primary provider of equipment and dental supplies, Defendant Serrao directly contacted Scott Anderson, President of Patterson Dental, via email on May 2, 2007 and issued the following warning:

> Scott[,] [r]umor is that Patterson is setting up PDG and their "new practices". I sure hope that is not true. I note that Bonnie [an employee of Patterson Dental] has sided with PDG, which is troubling. She needs to know that ADP is the customer.

89.     As a consequence of ADPI's unlawful interference, Patterson Dental declined to be PDG's supplier. ADPI and PDHC also warned off potential landlords from dealing with PDG. On April 11, 2007 and again on May 17, 2007, PDHC's CEO sent letters to various of PDG's prospective landlords informing them of the dispute between PDG and PDHC. Because of all of the above instances of unlawful interference, ADPI successfully derailed PDG's efforts to start new clinics. Investors who had contemplated investing in the new PDG dental practice, such as Signature Capital, a private equity investor, declined to provide financing to PDG.

90.     By failing to inform shareholders that ADPI's plan to keep operating the Park Dental clinics involved recruiting PDG's former dentists, that the plan was subject to heightened legal risk because it involved breaches of the Service Agreement and fiduciary duty, that the plan involved other unlawful conduct on the part of ADPI and PDHC, and that the plan was otherwise unworkable, Defendants misled ADPI's shareholders.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

91.     Based on the above fraudulent conduct, the following statements by Defendants during the Class Period were false and misleading.

92.     On February 25, 2004, ADPI issued a press release, which was later filed with the

SEC as an attachment to a February 26, 2004 Form 8-K filing signed by Feigh. The press release,

entitled "American Dental Partners Reports Fourth Quarter and Year End 2003 Financial

Results," stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced
> financial results today for the quarter and the year ended December
> 31, 2003.
>
> *Comparing the fourth quarter of 2003 with the fourth quarter of
> 2002:*
>
> - Net revenue was $42,004,000 as compared to $37,775,000, an
>   increase of 11%.
>
> - Earnings from operations were $3,860,000 as compared to
>   $2,387,000, an increase of 62%.
>
> - Net earnings were $1,810,000 as compared to $1,107,000, an
>   increase of 64%.
>
> - Diluted net earnings per share were $0.24 as compared to
>   $0.15, an increase of 60%.
>
> *Comparing the twelve months of 2003 with the same period in
> 2002:*
>
> - Net revenue was $163,707,000 as compared to $146,810,000,
>   an increase 12%.
>
> - Earnings from operations were $13,025,000 as compared to
>   $10,537,000, an increase of 24%.
>
> - Net earnings were $6,181,000 as compared to $4,707,000, an
>   increase of 31%.
>
> - Diluted net earnings per share were $0.82 as compared to
>   $0.63, an increase of 30%

93.     On March 17, 2004, the Company filed with the SEC its annual report on Form

10-K for the period ended December 31, 2003, which was signed by the Individual Defendants,

among others. In the Form 10-K, ADPI reported net revenues of $163,707,000, and net earnings

of $6,181,000. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"),

-32-

the Form 10-K included certifications signed by Defendants Serrao and Feigh stating that the Form 10-K did not include any material misrepresentations.

94.    On May 3, 2004, ADPI issued a press release entitled "American Dental Partners Reports First Quarter 2004 Financial Results." The press release, which was later filed with the SEC as an attachment to a May 4, 2004 Form 8-K filing signed by Feigh, stated in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the first quarter ended March 31, 2004.
>
> Comparing the first quarter of 2004 with the first quarter of 2003:
>
> • Net revenue was $44,064,000 as compared to $39,032,000, an increase of 13%.
>
> • Earnings from operations were $3,875,000 as compared to $2,527,000, an increase of 53%.
>
> • Net earnings were $2,064,000 as compared to $1,171,000, an increase of 76%.
>
> • Diluted net earnings per share were $0.26, as compared to $0.16, an increase of 63%.
>
> • Diluted cash net earnings per share were $0.35 as compared to $0.24, an increase of 46%.

95.    In the May 3, 2004 press release announcing ADPI's first quarter 2004 financial results, Defendant Serrao stated: "We are pleased with our continued strong financial performance. Our focused efforts on cash flow generation and improving our internal, same market growth rates are positively impacting our operating and financial performance." *See* Exhibit 99.1 to ADPI's Form 8-K dated May 4, 2004.

96.    On May 13, 2004, the Company filed with the SEC a Form 10-Q for the period ended March 31, 2004, which was signed by the Individual Defendants and reaffirmed the Company's previously announced first quarter financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations.

97.     On August 2, 2004, ADPI issued a press release entitled "American Dental Partners Reports Second Quarter and First Half 2004 Financial Results," which was filed with the SEC the same day as an attachment to a Form 8-K filing signed by Feigh. The press release stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and six-month period ended June 30, 2004.
>
> *Comparing the second quarter of 2004 with the second quarter of 2003:*
>
> - Net revenue was $45,044,000 as compared to $41,012,000, an increase of 10%.
>
> - Earnings from operations were $4,242,000 as compared to $3,321,000, an increase of 28%.
>
> - Net earnings were $2,319,000 as compared to $1,664,000, an increase of 39%.
>
> - Diluted net earnings per share were $0.29 as compared to $0.22, an increase of 32%.
>
> - Diluted cash net earnings per share were $0.37 as compared to $0.31, an increase of 19%.
>
> *Comparing the first six months of 2004 with the first six months of 2003:*
>
> - Net revenue was $89,108,000 as compared to $80,044,000, an increase of 11%.
>
> - Earnings from operations were $8,117,000 as compared to $5,848,000, an increase of 39%.
>
> - Net earnings were $4,383,000 as compared to $2,835,000, an increase of 55%.
>
> - Diluted net earnings per share were $0.55 as compared to $0.38, an increase of 45%.
>
> - Diluted cash net earnings per share were $0.72 as compared to $0.55, an increase of 31%.

98.     On August 11, 2004, the Company filed with the SEC a Form 10-Q for the period ended June 30, 2004, which was signed by the Individual Defendants and reaffirmed the Company's previously announced second quarter financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations. In its Form 10-Q for the second quarter of 2004, ADPI stated that it recorded an increase in total revenue that was primarily the result of "growth at our existing affiliated dental groups ..." *See* ADPI Form 10-Q dated August 11, 2004.

99.     On November 1, 2004, ADPI issued a press release entitled "American Dental Partners Reports Third Quarter And Year-To-Date 2004 Results," which was filed with the SEC the same day as an attachment to a Form 8-K filing signed by Feigh. The press release stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and nine month period ended September 30, 2004.
>
> *Comparing the third quarter of 2004 with the third quarter of 2003:*
>
> - Net revenue was $44,640,000 as compared to $41,659,000, an increase of 7%.
>
> - Earnings from operations were $3,692,000 as compared to $3,317,000, an increase of 11%.
>
> - Net earnings were $1,993,000 as compared to $1,536,000, an increase of 30%.
>
> - Diluted net earnings per share were $0.25 as compared to $0.20, an increase of 25%.
>
> - Diluted cash net earnings per share were $0.33 as compared to $0.28, an increase of 18%.
>
> *Comparing the first nine months of 2004 with the first nine months of 2003:*

-35-

- Net revenue was $133,748,000 as compared to $121,703,000, an increase of 10%.

- Earnings from operations were $11,809,000 as compared to $9,165,000, an increase of 29%.

- Net earnings were $6,376,000 as compared to $4,371,000, an increase of 46%.

- Diluted net earnings per share were $0.80 as compared to $0.58, an increase of 38%.

- Diluted cash net earnings per share were $1.04 as compared to $0.83, an increase of 25%.

100. On November 12, 2004, the Company filed with the SEC a Form 10-Q for the period ended September 30, 2004, which was signed by the Individual Defendants and reaffirmed the Company's previously announced third quarter financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations.

101. On February 23, 2005, ADPI issued a press release, which was later filed with the SEC as an attachment to a February 24, 2005 Form 8-K filing signed by Feigh, entitled "American Dental Partners Reports Fourth Quarter and Year End 2004 Financial Results And Announces Amended Credit Facility." The press release stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and the year ended December 31, 2004.
>
> *Comparing the fourth quarter of 2004 with the fourth quarter of 2003:*
>
> - Net revenue was $44,806,000, as compared to $42,004,000, an increase of 7%.
>
> - Earnings from operations were $3,929,000 as compared to $3,846,000, an increase of 2%.
>
> - Net earnings were $2,143,000 as compared to $1,810,000, an increase of 18%.

- Diluted net earnings per share were $0.26 as compared to $0.24, an increase of 8%.

- Diluted cash net earnings per share were $0.34 as compared to $0.32, an increase of 6%.

*Comparing the twelve months of 2004 with the same period in 2003:*

- Net revenue was $178,554,000 as compared to $163,707,000, an increase of 9%.

- Earnings from operations were $15,702,000 as compared to $12,988,000, an increase of 21%.

- Net earnings were $8,519,000 as compared to $6,181,000, an increase of 38%.

- Diluted net earnings per share were $1.06 as compared to $0.82, an increase of 29%.

- Diluted cash net earnings per share were $1.39 as compared to $1.15, an increase of 21%.

102.    In the February 23, 2005 press release announcing ADPI's financial results for the fourth quarter and year-end 2004, Defendant Serrao indicated that the Company generated record cash flow from operations in 2004 and was able to grow its net income by 38% for the year while continuing to reinvest in the business. *See* Exhibit 99.1 to ADPI's Form 8-K dated Feb. 24, 2005.

103.    On March 14, 2005, the Company filed with the SEC its annual report on Form 10-K for the period ended December 31, 2004, which was signed by the Individual Defendants, among others. In the Form 10-K, ADPI reported net revenues of $178,554,000, and net earnings of $8,519,000. Pursuant to Section 302 of Sarbanes-Oxley, the March 14, 2005, Form 10-K included certifications signed by Defendants Serrao and Feigh stating that the Form 10-K did not include any material misrepresentations.

104.    On April 27, 2005, ADPI issued a press release, which was later filed with the SEC as an attachment to a May 2, 2005 Form 8-K filing signed by Feigh, entitled "American Dental Partners Reports First Quarter 2005 Financial Results." The press release stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced
> financial results today for the first quarter ended March 31, 2005.
>
> *Comparing the first quarter of 2005 with the first quarter of 2004:*
>
> - Net revenue was $48,145,000 as compared to $44,064,000, an
>   increase of 9%.
>
> - Earnings from operations were $4,585,000 as compared to
>   $3,863,000, an increase of 19%.
>
> - Net earnings were $2,509,000 as compared to $2,064,000, an
>   increase of 22%.
>
> - Diluted net earnings per share were $0.30, as compared to
>   $0.26, an increase of 15%.
>
> - Diluted cash net earnings per share were $0.39 as compared to
>   $0.35, an increase of 11%.

105.    On May 9, 2005, the Company filed with the SEC a Form 10-Q for the period
ended March 31, 2005, which was signed by the Individual Defendants and reaffirmed the
Company's previously announced first quarter financial results. Pursuant to Section 302 of
Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh
stating that the Form 10-Q did not include any material misrepresentations.

106.    In its Form 10-Q for the first quarter of 2005, ADPI stated that its increase in net
revenue "was attributable to same market net revenue growth from our affiliated dental group
practices ... and incremental net revenue earned from our platform affiliation completed in
February 2005, offset by a decrease in other revenue ... primarily attributable to a decrease in
dental laboratory fees as a result of an increasing percentage of fees being earned from our
affiliated dental groups." *See* ADPI's Form 10-Q dated May 9, 2005.

107.    On July 27, 2005, ADPI issued a press release, which was later filed with the SEC
as an attachment to a Form 8-K filing signed by Feigh, entitled "American Dental Partners
Reports Second Quarter and First Half 2005 Financial Results." The press release stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced
> financial results today for the quarter and six-month period ended
> June 30, 2005.

*Comparing the second quarter of 2005 with the second quarter of 2004:*

- Net revenue was $49,427,000 as compared to $45,044,000, an increase of 10%.

- Earnings from operations were $5,280,000 as compared to $4,230,000, an increase of 25%.

- Net earnings were $2,954,000 as compared to $2,319,000, an increase of 27%.

- Diluted net earnings per share were $0.35, as compared to $0.29, an increase of 21%.

- Diluted cash net earnings per share were $0.44 as compared to $0.37, an increase of 19%.

*Comparing the first six months of 2005 with the first six months of 2004:*

- Net revenue was $97,572,000 as compared to $89,108,000, an increase of 9%.

- Earnings from operations were $9,865,000 as compared to $8,093,000, an increase of 22%.

- Net earnings were $5,463,000 as compared to $4,383,000, an increase of 25%.

- Diluted net earnings per share were $0.65 as compared to $0.55, an increase of 18%.

- Diluted cash net earnings per share were $0.83 as compared to $0.72, an increase of 15%.

108.     On August 9, 2005, the Company filed with the SEC a Form 10-Q for the period ended June 30, 2005, which was signed by the Individual Defendants and reaffirmed the Company's previously announced second quarter financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations.

109.     On October 26, 2005, ADPI issued a press release entitled "American Dental Partners Reports Third Quarter and Nine Months 2005 Results." The press release, which was

later filed with the SEC as an attachment to a November 1, 2005 Form 8-K filing signed by

Feigh, stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and nine month period ended September 30, 2005....
>
> *Comparing the third quarter of 2005 with the third quarter of 2004:*
>
> - Net revenue was $49,573,000 as compared to $44,640,000, an increase of 11%.
>
> - Earnings from operations were $4,102,000 as compared to $3,680,000, an increase of 11%.
>
> - Net earnings were $2,188,000 as compared to $1,993,000, an increase of 10%.
>
> - Diluted net earnings per share were $0.17, as compared to $0.16, an increase of 6%.
>
> - Diluted cash net earnings per share were $0.23 as compared to $0.22, an increase of 5%.

110. On November 9, 2005, the Company filed with the SEC a Form 10-Q for the period ended September 30, 2005, which was signed by the Individual Defendants and reaffirmed the Company's previously announced third quarter financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations.

111. On February 6, 2006, ADPI issued a press release, which was filed with the SEC the same day as an attachment to a Form 8-K filing signed by Feigh, in which the Company responded to the filing of the PDG Lawsuit stating that the Company had "reviewed the complaint and believes the allegations are baseless and without merit. The Company further believes that the relationship between PDHC and PDG, including the terms of the Service Agreement, is in compliance with applicable laws." ADPI further stated that "the Company

conducts its business at Park Dental today as it has since entering into the affiliation with PDG nine years ago and intends to continue to do so."

112.    On February 22, 2006, ADPI issued a press release, which was later filed with the SEC as an attachment to a February 23, 2006 Form 8-K filing signed by Feigh. The press release, entitled "American Dental Partners Reports Fourth Quarter and Year End 2005 Financial Results," stated in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and the year ended December 31, 2005.
>
> *Comparing the fourth quarter of 2005 with the fourth quarter of 2004:*
>
> - Net revenue was $49,783,000 as compared to $44,806,000, an increase of 11%.
>
> - Earnings from operations were $4,722,000 as compared to $3,929,000, an increase of 20%.
>
> - Net earnings were $2,640,000 as compared to $2,143,000, an increase of 23%.
>
> - Diluted net earnings per share were $0.21, as compared to $0.17, an increase of 24%.
>
> - Diluted cash net earnings per share were $0.27 as compared to $0.23, an increase of 17%.
>
> *Comparing the twelve months of 2005 with the same period in 2004:*
>
> - Net revenue was $196,928,000 as compared to $178,554,000, an increase of 10%.
>
> - Earnings from operations were $18,689,000 as compared to $15,702,000, an increase of 19%.
>
> - Net earnings were $10,291,000 as compared to $8,519,000, an increase of 21%.
>
> - Diluted net earnings per share were $0.81 as compared to $0.70, an increase of 16%.

- Diluted cash net earnings per share were $1.05 as compared to $0.92, an increase of 14%.

113.   In the February 22, 2006 press release commenting on ADPI's 2005 financial results, Defendant Serrao attributed the 21% increase in net earnings to "growth and innovation," including reinvestment in "capital expenditures and additional inmarket affiliations for the benefit of our affiliated dental group practices."   See Exhibit 99.1 to ADPI's Form 8-K dated February 23, 2006.

114.   On February 23, 2006, during a conference call with investors, Defendant Serrao stated that ADPI had reviewed the complaint and "believe[s] the allegations are baseless and without merit. As discussed in our press release, we view this lawsuit as a means to an end, a desire by the directors of PDG to undo a transaction that was fairly negotiated and structured between two parties nearly 10 years ago."

115.   On March 10, 2006, the Company filed with the SEC its annual report on Form 10-K for the period ended December 31, 2005, which was signed by the Individual Defendants, among others. In the Form 10-K, ADPI reported net revenues of $196,928,000, and net earnings of $10,291,000. Pursuant to Section 302 of Sarbanes-Oxley, the March 10, 2006, Form 10-K included certifications signed by Defendants Serrao and Feigh stating that the Form 10-K did not include any material misrepresentations. In the Form 10-K, the Company referred to the PDG Lawsuit and stated that "PDHC believes the claims made by PDG are baseless ..."

116.   In ADPI's Form 10-K or the year ended December 31, 2005, the Company's increase in net revenue from 2003 to 2004 was represented to be "attributable to a 9.3% increase in same market net revenue growth and incremental net revenue earned from our platform affiliation completed in May 2003, offset by a decrease in other revenue," while the increase from 2004 to 2005 "was attributable to an 8.5% increase in same market net revenue growth and incremental net revenue earned from our platform affiliation completed in February 2005, offset by a decrease in revenue."   See ADPI's Form 10-K dated March 10, 2006.

117.    On May 1, 2006, the Company issued a press release entitled "American Dental Partners Reports First Quarter 2006 Results," which was later filed with the SEC as an attachment to a May 2, 2006 Form 8-K filing signed by Feigh. The press release stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the first quarter ended March 31, 2006.
>
> *Comparing the first quarter of 2006 with the first quarter of 2005.*
>
> - Net revenue was $54,066,000 as compared to $48,145,000, an increase of 12%.
>
> - Earnings from operations were $5,088,000 as compared to $4,585,000, an increase of 11%.
>
> - Net earnings were $2,791,000 as compared to $2,509,000, an increase of 11%.
>
> - Diluted net earnings per share were $0.22 as compared to $0.20, an increase of 10%.
>
> - Diluted cash net earnings per share were $0.28 as compared to $0.26, an increase of 8%.

118.    On May 9, 2006, the Company filed a Form 10-Q with the SEC for the quarterly period ended March 31, 2006, which was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations. With respect to the PDG Lawsuit, ADPI again asserted that "PDHC believes the claims made by PDG are baseless ..."

119.    On May 2, 2006, during a conference call with investors to discuss the 2006 first quarter results, Serrao addressed the ongoing litigation with PDG, stating that "the directors of PDG wish to undo a transaction that was fairly negotiated and structured between the parties through a complaint that contains claims that are without merit."

120.    On July 31, 2006, the Company issued a press release entitled "American Dental Partners Reports Second Quarter and First Half 2006 Financial Results," which was later filed

with the SEC as an attachment to an August 1, 2006 Form 8-K signed by Feigh. The press release stated, in relevant part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and six month period ended June 30, 2006.
>
> *Comparing the second quarter of 2006 with the second quarter of 2005:*
>
> - Net revenue was $55,078,000 as compared to $49,427,000, an increase of 11%.
>
> - Earnings from operations were $5,723,000 as compared to $5,280,000, an increase of 8%. Excluding stock-based compensation expense from 2006 results [...], earnings from operations increased 15%.
>
> - Net earnings were $3,183,000 as compared to $2,954,000, an increase of 8%. Excluding stock-based compensation expense from 2006 results [...], net earnings increased 15%.
>
> - Diluted net earnings per share were $0.25, as compared to $0.23, an increase of 9%. Excluding stock-based compensation expense from 2006 results [...], diluted earnings per share increased 17%.
>
> - Diluted cash net earnings per share were $0.31 as compared to $0.29, an increase of 7%. Excluding stock-based compensation expense from 2006 results [...], diluted cash net earnings per share increased 14%.

121.   On August 9, 2006, the Company filed with the SEC a Form 10-Q for the quarterly period ended June 30, 2006, which was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by Individual Defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations. With respect to the claims asserted by PDG in the PDG Lawsuit, ADPI stated that "PDHC believes the claims made by PDG are baseless ..."

122.    In its Form 10-Q for the second quarter of 2006, ADPI stated that the increases in net revenue and net earnings during the second quarter and first half of 2006 were primarily due to same market net revenue growth at the affiliated dental groups, while salaries and benefits as a percentage of net revenue decreased "due to increased productivity at the affiliated dental groups." ADPI also stated that "[o]ur growth to date has resulted in large measure from our ability to affiliate with additional dental practices." *See* ADPI's Form 10-Q dated August 9, 2006.

123.    In a conference call with analysts and investors on August 1, 2006 regarding the second quarter 2006 results, Serrao further misled investors as to the nature and purpose of its recent Minnesota affiliations:

> ANALYST: I assume and just checking on this that the launching of the two de novos here in Minnesota is in compliance with your service agreement with PDG as well?
>
> SERRAO: Well right. ... we were approached by a couple of doctors who have a desire to build a dental group practice and didn't want to do it entirely on their own. So our needs matched and so we entered into this new affiliation.

Serrao's statements were false and misleading because he omitted to disclose that ADPI had already decided to sever its relationship with PDG, and in furtherance of this plan, it was ADPI who had approached the doctors.

124.    On October 30, 2006, the Company issued a press release that was later filed with the SEC as an attachment to October 31, 2006 Form 8-K signed by Feigh, entitled "American Dental Partners Reports Third Quarter and Nine Months 2006 Financial Results." The press release stated, in part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and nine month period ended September 30, 2006.
>
> *Comparing the third quarter of 2006 with the third quarter of 2005:*

- Net revenue was $53,842,000 as compared to $49,573,000, an increase of 9%.

- Earnings from operations were $4,441,000 as compared to $4,102,000, an increase of 8%. Excluding stock-based compensation expense from 2006 results [...], earnings from operations increased 17%.

- Net earnings were $2,414,000 as compared to $2,188,000, an increase of 10%. Excluding stock-based compensation expense from 2006 results [...], net earnings increased 20%.

- Diluted net earnings per share were $0.19, as compared to $0.17, an increase of 12%. Excluding stock-based compensation expense from 2006 results [...], diluted net earnings per share increased 18%.

- Diluted cash net earnings per share were $0.25 as compared to $0.23, an increase of 9%. Excluding stock-based compensation expense from 2006 results [...], diluted 13 cash net earnings per share increased 17%.

125.    On November 8, 2006, the Company filed with the SEC a Form 10-Q for the quarterly period ended September 30, 2006, which was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations. With respect to the PDG Lawsuit, ADPI again stated that "PDHC believes the claims made by PDG are baseless ..."

126.    On February 21, 2007, ADPI issued a press release, which was later filed with the SEC as an attachment to a February 22, 2007 Form 8-K filing signed by Feigh. The press release, entitled "American Dental Partners Reports Fourth Quarter and Year End 2006 Financial Results," stated, in part:

American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and the year ended December 31, 2006.

*Comparing the fourth quarter of 2006 with the fourth quarter of 2005:*

- Net revenue was $54,931,000 as compared to $49,783,000, an increase of 10%.

- Earnings from operations were $4,930,000 as compared to $4,722,000, an increase of 4%. Excluding stock-based compensation expense from 2006 results (discussed below), earnings from operations increased 12%.

- Net earnings were $2,746,000 as compared to $2,640,000, an increase of 4%. Excluding stock-based compensation expense from 2006 results (discussed below), net earnings increased 13%.

- Diluted net earnings per share were $0.21, as compared to $0.21. Excluding stock-based compensation expense from 2006 results (discussed below), diluted net earnings per share increased 10%.

- Diluted cash net earnings per share were $0.28 as compared to $0.27, an increase of 4%. Excluding stock-based compensation expense from 2006 results (discussed below), diluted cash net earnings per share increased 7%.

*Comparing the twelve months of 2006 with the same period in 2005:*

- Net revenue was $217,917,000 as compared to $196,928,000, an increase of 11%.

- Earnings from operations were $20,182,000 as compared to $18,689,000, an increase of 8%. Excluding stock-based compensation expense from 2006 results (discussed below), earnings from operations increased 15%.

- Net earnings were $11,134,000 as compared to $10,291,000, an increase of 8%. Excluding stock-based compensation expense from 2006 results (discussed below), net earnings increased 17%.

- Diluted net earnings per share were $0.86 as compared to $0.81, an increase of 6%. Excluding stock-based compensation expense from 2006 (discussed below), diluted net earnings per share increased 15%.

- Diluted cash net earnings per share were $1.11 as compared to $1.05, an increase of 6%. Excluding stock-based compensation expense from 2006 (discussed below), diluted cash net earnings per share increased 12%.

-47-

127.    On February 22, 2007, during a conference call with investors, Defendant Serrao stated that, with respect to the PDG Lawsuit, "[i]t is our continuing belief that the allegations contained in the complaint are baseless and without merit and, as such, we have been defending and intend to continue to defending ourselves vigorously." This statement was misleading because Defendants knew that PDHC was in material breach of the Service Agreement.

128.    On March 9, 2007, the Company filed its annual report on Form 10-K for the period ended December 31, 2006. The Form 10-K was signed by the Individual Defendants, among others, and reported net revenues of $217,917,000 and net earnings of $11,134,000. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-K included certifications signed by defendants Serrao and Feigh stating that the Form 10-K did not include any material misrepresentations. With respect to the PDG Lawsuit, ADPI stated that "PDHC believes the claims made by PDG are baseless ..."

129.    According to ADPI's Form 10-K for the year ended December 31, 2006, the increase in net revenue for that year was attributed to "same market net revenue growth in addition to net revenue earned from our platform affiliations completed in 2006 and 2005." The Form 10-K stated that "[e]arnings from operations as a percentage of net revenue increased in 2005 primarily due to increased productivity as a result of higher same market growth rates and leveraging of corporate expenses and other costs," and that ADPI's "growth to date has resulted in large measure from our ability to affiliate with additional dental practices." *See* ADPI's Form 10-K date March 9, 2007.

130.    On April 3, 2007, ADPI issued a press release that was filed with the SEC the same day as an attachment to a Form 8-K signed by Serrao, in which ADPI stated that "the lawsuit brought by PDG is nothing more than PDG attempting to undo a transaction that was fairly negotiated over ten years ago by two well represented parties. ... [A]ccording to the provisions of the Service Agreement, PDG cannot terminate the agreement unilaterally except in limited circumstances. The Company believes that none of those circumstances apply and that PDG would have significant legal exposure if it attempts to terminate the Service Agreement

without first proving in court a material breach of the agreement by PDHC." ADPI's statements in this press release were misleading because Defendants knew that PDHC was in material breach of the Service Agreement, as a jury later found, and that PDG therefore had a basis for terminating the Service Agreement.

131.    On April 4, 2007, ADPI conducted a conference call with investors. During the conference call, Defendant Serrao stated that there had been no changes to the way ADPI had executed its obligations under the Service Agreement, that PDHC had not breached material provisions of the Service Agreement, and that ADPI would "continue to operate [the] Park Dental business consistent with the service agreement and our past practices." Each of these statements was false, because Defendants knew that PDHC had materially breached the Service Agreement and that PDHC had departed from the practices that were in place when PDHC first affiliated with PDG.

132.    On April 30, 2007, the Company issued a press release, which was later filed with the SEC as an attachment to a May 1, 2007 Form 8-K signed by Feigh, entitled "American Dental Partners Reports First Quarter 2007 Financial Results," stating, in relevant part, as follows:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the first quarter ended March 31, 2007.
>
> *Comparing the first quarter of 2007 with the first quarter of 2006:*
>
> - Net revenue was $65,458,000 as compared to $54,066,000, an increase of 21%.
>
> - Earnings from operations were $7,223,000 as compared to $5,088,000, an increase of 42%.
>
> - Net earnings were $3,879,000 as compared to $2,791,000, an increase of 39%.
>
> - Diluted net earnings per share were $0.30. as compared to $0.22, an increase of 36%.
>
> - Diluted cash net earnings per share were $0.36 as compared to $0.28, an increase of 29%.

-49-

133.    On May 9, 2007, the Company filed a Form 10-Q with the SEC for the quarterly period ended March 31, 2007, which was signed by the Individual Defendants, and reaffirmed the Company's previously announced financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations. In its disclosures pertaining to the PDG Lawsuit, ADPI again stated that "PDHC believes the claims made by PDG are baseless . . .

134.    In ADPI's Form 10-Q for the first quarter of 2007, the Company's increase in net revenue "was attributable to net revenue earned from platform acquisitions and affiliations completed in 2006 and same market net revenue growth from our affiliated dental groups ...." ADPI stated that "[e]arnings from operations increased as a percentage of net revenue primarily due to improved facility utilization, revenue earned from 2006 acquisitions and affiliations and leveraging of other operating and general corporate expenses." Again, ADPI stated: "Our growth to date has resulted in large measure from our ability to affiliate with additional dental practices." See ADPI's Form 10-Q dated May 9, 2007.

135.    On July 30, 2007, the Company issued a press release, which was later filed with the SEC as an attachment to a July 31, 2007 Form 8-K signed by Feigh, entitled "American Dental Partners Reports Second Quarter and First Half 2007 Financial Results," which stated, in relevant part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and six months ended June 30, 2007.
>
> *Comparing the second quarter of 2007 with the second quarter of 2006:*
>
> - Net revenue was $66,552,000 as compared to $55,078,000, an increase of 21%.
>
> - Earnings from operations were $8,187,000 as compared to $5,723,000, an increase of 43%.

- Net earnings were $4,528,000 as compared to $3,183,000, an increase of 42%.

- Diluted net earnings per share were $0.34, as compared to $0.25, an increase of 36%.

- Diluted cash net earnings per share were $0.41 as compared to $0.31, an increase of 32%.

136.    In an investor conference call regarding ADPI's second quarter 2007 financial results, Serrao stated that ADPI's "affiliated dental groups are experiencing strong same-market revenue growth and improved operating margins. In addition, the corporate development activities have been robust, much as we predicted would be the case last year."

137.    On August 9, 2007, the Company filed a Form 10-Q with the SEC for the quarterly period ended June 30, 2007, which was signed by the Individual Defendants, and reaffirmed the Company's previously announced financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations. With respect to the PDG Lawsuit, ADPI stated: "PDHC believes PDG's claims in the PDG Complaint and PDG's counterclaims in the PDHC Complaint are baseless and without merit."

138.    In its Form 10-Q for the second quarter of 2007, ADPI stated that net revenue for the three months and the six months ended June 30, 2007 had increased due to "net revenue earned from platform acquisitions and affiliations completed in 2006 and same market net revenue growth from our affiliated dental groups." See ADPI's Form 10-Q dated August 9, 2007.

139.    On October 29, 2007, the Company issued a press release, which was later filed with the SEC as an attachment to an October 30, 2007 Form 8-K signed by Feigh, entitled "American Dental Partners Reports Third Quarter and Nine Months 2007 Financial Results" (the October 29, 2007 Press Release) which stated, in relevant part:

> American Dental Partners, Inc. (NASDAQ:ADPI) announced financial results today for the quarter and nine months ended September 30, 2007.

Comparing the third quarter of 2007 with the third quarter of 2006:

- Net revenue was $67,162,000 as compared to $53,842,000, an increase of 25%.

- Earnings from operations were $5,252,000 as compared to $4,441,000, an increase of 18%.

- Net earnings were $2,701,000 as compared to $2,414,000, an increase of 12%.

- Diluted net earnings per share were $0.20 as compared to $0.19, an increase of 5%.

- Diluted cash net earnings per share were $0.28 as compared to $0.25. an increase of 12%.

140.    The October 29, 2007 Press Release also stated:

Based on litigation developments subsequent to September 30, 2007, the Company is proceeding on the basis that PDHC, Ltd. will no longer provide dental facilities and business services after December 31, 2007 to PDG, P.A. pursuant to the Service Agreement between the two parties. Accordingly, the Company is assessing the potential impairment of the intangible asset associated with the Service Agreement between PDHC and PDG. ... The Company has entered into a new affiliation with a Minnesota professional limited liability company. The Company intends to continue to operate its Park Dental business with this Minnesota affiliated practice effective January 1, 2008.

141.    In the Form 8-K to which this press release was attached, dated October 30, 2007, ADPI again stated that "PDG's claims in the PDG Complaint and PDG's counterclaims in the PDHC complaint are baseless and without merit."

142.    On November 9, 2007, the Company filed a Form 10-Q with the SEC for the quarterly period ended September 30, 2007, which was signed by the Individual Defendants, and reaffirmed the Company's previously announced financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by defendants Serrao and Feigh stating that the Form 10-Q did not include any material misrepresentations. With respect to the PDG Lawsuit, ADPI stated: "PDHC believes PDG's claims in the PDG Complaint and PDG's counterclaims in the PDHC Complaint are baseless and without merit."

143.    In its Form 10-Q for the t r quarter of 2007, ADPI attributed its increased earnings to "net revenue earned from platform acquisitions and affiliations completed in 2006 and 2007 and same market net revenue growth from our affiliated dental groups...." ADPI again stated: "Our growth to date has resulted in large measure from our ability to affiliate with additional dental practices." *See* ADPI's Form 10-Q dated November 9, 2007.

144.    Defendants' statements with respect to ADPI's financial results, set forth in the foregoing paragraphs, were false and misleading because Defendants represented the financial results as legitimately obtained and accrued according to generally accepted accounting principles, when in fact a substantial amount of ADPI's earnings and revenues constituted money that ADPI wrongfully diverted to itself from PDG under the Service Agreement. In addition, Defendants' repeated characterization of the claims by PDG in the PDG Lawsuit as "baseless" and "without merit" was false and misleading because Defendants knew that PDHC was in material breach of the Service Agreement, as a jury later found. Furthermore, the statements in the October 29, 2007 press release and the October 30, 2007 Form 8-K to which it was attached were materially false and misleading because they failed to disclose that ADPI's proposed business plan to continue operating the Park Dental clinics without PDG's dentists was subject to heightened legal risk, dependent on unlawful conduct by ADPI and PDHC, and was otherwise unworkable.

145.    With respect to each of the false and misleading statements set forth in the foregoing paragraphs, the facts that were misrepresented and/or omitted by Defendants were material to the investment decisions of ADPI's investors. For example, the amounts diverted by ADPI from PDG and fraudulently incorporated by ADPI in its financial statements in the period 2002 through 2007 totaled more than $15,319,647, which was a significant proportion of the service fees that ADPI purportedly earned from its affiliation with PDG during that five year period. (ADPI earned just $105 million in service fees from PDG during the entire period of the affiliation from 1996 through 2007). The service fees earned from PDG in turn accounted for approximately 30% of the revenues reported by ADPI annually. Knowledge that ADPI was

-53-

breaching the Service Agreement and otherwise acting unlawfully toward its single largest customer, and thus placing that customer relationship and the Company's reputation in the industry at risk and subjecting the Company to the threat of a substantial liability, would have been material to investors' evaluation of a potential investment in ADPI. As a jury later found, ADPI's and PDHC's unlawful conduct exposed ADPI to a total liability of approximately $130 million in compensatory and punitive damages, an amount which was many times ADPI's annual reported net earnings.

### THE TRUTH BEGINS TO EMERGE—ADPI'S DECEPTION IS REVEALED

146.    On December 12, 2007, after a nearly one-month trial in the PDG Lawsuit, a jury found both ADPI and PDHC liable to PDG and awarded total compensatory damages of $88,290,647. The jury found that PDHC had:

- breached the Service Agreement (resulting in compensatory damages of $9.4 million);

- breached the implied covenant of good faith and fair dealing (resulting in compensatory damages of $11.5 million); and

- breached its fiduciary duty to PDG (resulting in compensatory damages of $200,000).

The jury also found that both ADPI and PDHC had:

- tortiously interfered with PDG's contractual relationships with its dentists (resulting in compensatory damages of $33.5 million); and

- tortiously interfered with PDG's prospective advantage with "doctors, patients, Patterson Dental and Signature Capital," that is, PDG's attempts to set up its new practice (resulting in compensatory damages of $33.5 million).

147.    On this news, ADPI's stock fell from a closing price of $19.70 on December 11, 2007 to $14.34 at the close on December 12, 2007.

148.    On December 13, 2007, the jury returned a further verdict on PDG's claim against ADPI and PDHC for punitive damages. The jury awarded $21.125 million on PDG's claim that

ADPI and PDHC tortiously interfered with PDG's relationship with its dentists, finding that ADPI and PDHC had acted "with deliberate disregard for the rights of PDG." The jury awarded another $21.125 million on PDG's claim that ADPI and PDHC tortiously interfered with PDG's attempts to establish a new practice, again finding that ADPI and PDHC had acted "with deliberate disregard for the rights of PDG." On the revelation of the additional punitive damages award, ADPI's stock plummeted to close at just $4.62 on December 13, 2007. In total, PDHC and ADPI's conduct cost ADPI approximately $130 million in compensatory and punitive damages.

149.    On December 14, 2007, ADPI commenced a mediation with PDG. On December 26, 2007, ADPI and PDG entered into a settlement whereby ADPI agreed to transfer to PDG the leases and associated tangible assets with respect to 25 of 31 Park Dental facilities as well as various trade names, including "Park Dental." In this manner, ADPI restored control of the facilities to PDG, as was originally intended under the Service Agreement. ADPI agreed to provide interim management services for a period of up to nine months for a management fee of $19 million. ADPI also agreed to forgive outstanding accounts receivable due from PDG, which, as of September 30, 2007, were approximately $3 million.

## LOSS CAUSATION

150.    Throughout the relevant period, the Defendants' materially false and misleading statements and omissions concerning ADPI's financial performance and business plans with respect to the Service Agreement caused ADPI's stock price to be inflated. As a result of Defendants' false and misleading statements and material omissions, ADPI's common stock traded between $12 and $28 (split-adjusted) for most of the relevant period, reaching a high of $28.64 on June 15, 2007.

151.    Plaintiffs suffered damages as a direct result of Defendants' fraudulent conduct described in this Complaint. But for Defendants' misrepresentations and omissions, Plaintiffs would not have purchased ADPI's stock, or would not have purchased it at artificially inflated

prices. When the reality of Defendants' conduct and the true financial condition of ADPI was revealed to the investing public, the price of ADPI common stock declined significantly, as described below.

152. On February 3, 2006, PDG commenced the PDG Lawsuit against PDHC. ADPI issued a press release announcing this development on February 6, 2006, the first trading day following the filing of the lawsuit. After closing at $16.41 per share on February 3, 2006, ADPI's stock price dropped to $13.66 on February 6, 2006, and then to $11.49 at the close of trading on February 7, 2006. While the commencement of the PDG Lawsuit and the announcement of this development by ADPI did not reveal the entirety of ADPI's fraudulent conduct, the events constituted a partial revelation of the fraud, causing ADPI's stock to drop.

153. On October 29, 2007, partial details of a further aspect of ADPI's fraud were revealed when ADPI confirmed that it would not continue to perform under the Service Agreement after December 31, 2007. In response to this announcement, ADPI's stock price dropped from a closing price of $28.44 on October 29, 2007 to close at $24.96 on October 30, 2007. Over the next week, ADPI's stock continued to drop, closing at $19.95 on November 7, 2007.

154. On December 12 and 13, 2007, APDI's fraudulent conduct was further revealed when the jury hearing the PDG Lawsuit returned verdicts directing ADPI and PDHC to pay PDG a total of approximately $130 million in compensatory and punitive damages. The jury's verdict demonstrated that ADPI had, in fact: (i) siphoned money to itself that was due to PDG under the Service Agreement, which ADPI then incorporated into its earnings reports; (ii) usurped power under the Service Agreement and cut expenditures that it was obligated to make under the Service Agreement, again boosting ADPI's reported earnings from the Service Agreement; (iii) by no later than April 2007, formed the intention to torpedo the Service Agreement and sever all ties with PDG; and (iv) failed to disclose to investors that, in furtherance of its intention to torpedo the Service Agreement, ADPI was implementing a plan to continue operating the Park Dental clinics after December 31, 2007 that involved numerous breaches of PDHC's contractual

-56-

obligations, unlawful interference with PDG's own business plans, and other instances of unlawful behavior. As a result of the above revelations, ADPI's stock price plunged from a closing price of $19.70 on December 11, 2007 to close at just $4.62 on December 13, 2007, a loss of more than 75% in just two days. Plaintiffs incurred significant losses as a consequence.

## ADDITIONAL ALLEGATIONS OF SCIENTER

155.   As set forth above, the Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued by ADPI were materially false and misleading; knew or recklessly disregarded the fact that such statements would be disseminated amongst the investing public; and knowingly and substantially participated in the issuance and dissemination of the public documents and statements. In addition, the Defendants acted with scienter by intentionally failing to inform the market in a timely manner of material information. As set forth in detail below, the Defendants' intent to deceive and/or reckless disregard for the truth is demonstrated by direct evidence as well as circumstantial evidence supporting a strong inference of scienter.

156.   *First,* as alleged elsewhere in this Complaint, the Defendants were active and culpable participants in the misconduct toward PDG that lies at the heart of the fraud perpetrated on ADPI's investors. As the jury hearing the PDG Lawsuit later found when awarding compensatory and punitive damages to PDG, ADPI and PDHC acted "with deliberate disregard for the rights of PDG." This conduct, which involved ADPI's relationship with its single largest customer, could not have been perpetrated over such a substantial period of time (between 2002 and 2007) without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants. Moreover, given the importance of the PDG relationship to ADPI, accounting for 30% of its business, ADPI and its senior executives (including the Individual Defendants) had to know—and were severely reckless if they did not know—that their breaches of the Service Agreement and other misconduct toward PDG would have a material negative effect on ADPI's stock price if they were disclosed to ADPI's investors,

-57-

and that the non-disclosure of this information rendered the Defendants' public statements during the relevant period materially false and misleading.

157.   Defendants knew that ADPI's revenues and earnings were inflated by amounts of money that should have been paid to PDG. Defendants ADPI and Serrao participated in the negotiations that resulted in the First Amendment, under which PDG obtained an additional 1% of patient revenues as part of the Provider Expense, and knew of the failure by ADPI to pay this amount to PDG between 2002 and 2007. Each of the Individual Defendants knew of the past practice by which, if a budget had not been approved for the upcoming year, the most recently approved budget should roll forward, because Defendant Serrao described this practice, in the presence of Feigh and Vargo, to investors during a conference call with investors. Defendant Serrao directed PDHC's CEO not to make the 2005 budget retroactive, as had been done as a matter of past practice, therefore diverting further sums to ADPI that were due to PDG under the Service Agreement. And Defendant Feigh continually instructed ADPI and PDHC's accounting staff to ensure that money held in PDG's account was swept to ADPI's bank account, thereby depriving PDG of the opportunity to earn interest on that money.

158.   Defendant Serrao introduced the Healthy Organization policy to ADPI's affiliated dental groups, and under the guise of this policy, directed and participated in the campaign to wrest control of the Park Dental clinics from PDG, so that ADPI could cut expenses and exploit the PDG affiliation to meet ADPI's financial goals. Among other things, Defendant Serrao made unannounced visits to the Park Dental clinics, conducted presentations to the staff, engaged in a letter-writing complaint campaign and took other measures to undermine the authority of PDG. Defendant Serrao knew that these actions were in breach of the Service Agreement because PDG repeatedly objected to his actions as being in breach of contract and requested Serrao to stop his conduct. ADPI also introduced Healthy Organization without obtaining the approval of the full Policy Board, as was required by the Service Agreement. He therefore knew that, to the extent these actions allowed ADPI to cut costs and inflate ADPI's reported revenues and earnings,

ADPI's reported revenues and earnings did not reflect the true financial results that would have been achieved if ADPI had complied with the Service Agreement.

159.    Defendant Serrao also participated in and led the decision to terminate the PDG affiliation. Serrao directed the efforts to establish Ludke PLLC and to recruit PDG's dentists. He therefore knew that it was misleading not to disclose to investors that ADPI intended to sever the PDG relationship, and to repeatedly assure investors to the contrary.

160.    Defendant Serrao also directed and participated in ADPI's efforts to interfere with the PDG dentists' attempt to relocate to new dental clinics. Among other actions, Serrao supervised and directed ADPI's efforts to recruit the Park Dental dentists, even though ADPI knew recruiting the dentists could result in a violation of these dentists' non-compete obligations to PDG. Serrao ordered that PDHC withhold patient records from PDG, even though Serrao was aware the records belonged to PDG. Serrao also communicated directly with third parties in order to warn them about doing business with the new practice that PDG was attempting to establish. Serrao and the other Defendants therefore knew that it was misleading not to disclose to investors the legal risks associated with ADPI's plan to staff the Park Dental clinics.

161.    *Second,* a strong inference of scienter is raised by the fact that the Individual Defendants had unfettered access to all financial information, were intimately involved in the day-to-day management of ADPI, and had direct oversight of and actively managed the accounting practices at ADPI, including the calculation of Provider Expense and the Contribution Margin. Also, given Serrao's position as CEO, Feigh's position as Chief Financial Officer and Treasurer, and Vargo's position as Chief Accounting Officer, the Individual Defendants each were involved in decisions concerning accounting issues and directly knew of, or through the supervisory nature of their positions learned about, or deliberately or with extreme recklessness disregarded, the mis-reporting of ADPI's revenues and earnings from the PDG affiliation.

162.    *Third,* a strong inference of scienter is raised by the fact that the Individual Defendants had a substantial financial motive to improperly inflate ADPI's revenues and

earnings because a major part of ADPI's executive compensation program, which consists of cash bonuses ranging from 25% to 100% of annual base salaries, derived from the Company meeting its Earnings from Operations ("EFO") target. This target was set forth in ADPI's annual operating plan. According to the proxy statement ADPI filed with the SEC on March 20, 2007, Individual Defendants Serrao, Feigh and Vargo earned salaries of $433,500, $261,375 and $150,400, respectively, for the year ended December 31, 2006. Because ADPI exceeded its $21.1 million EFO target, Serrao, Feigh and Vargo received additional cash bonuses of $344,000, $209,100 and $37,600, respectively. Defendants were able to exceed the EFO target in large part because of their improper conduct in siphoning money to ADPI that was due to PDG, and by cutting numerous expenditures that should have been made under the Service Agreement.

163. *Fourth,* a strong inference of scienter is raised by the fact that Individual Defendants Serrao and Feigh had a substantial financial motive to commit fraud because they were able to profit from conducting large and unusual insider sales of ADPI stock at prices artificially inflated by the fraud. The insider sales were extremely large, not just in absolute terms, but when compared against the insiders' total stock holdings during the Class Period, and when compared to the Individual Defendants' base income in those same years. Furthermore, the insider sales were unusual in their timing.

164. As reflected in the chart below, Defendant Serrao sold almost 600,000 shares for more than $9.7 million between March 10, 2004 and May 8, 2007, while in possession of knowledge about the fraud. These sales amounted to 82.7% of Serrao's total beneficial holdings of 684,240 shares at the start of the Class Period (based on the numbers disclosed in ADPI's March 31, 2004 Proxy Statement). Furthermore, Serrao's sales were large when compared to his annual compensation. In 2007, a year in which Serrao earned nearly $450,000 in regular compensation and more than $1.2 million in total salary and bonuses, Serrao sold more than 155,000 shares of ADPI stock, equivalent to 17% of his holdings at that time, for a profit of more than $2.8 million. The profits from these stock sales were more than six times his base salary in that same year. Similarly, in 2005, Serrao reaped profits from his sales totaling nearly $3 million,

approximately seven times his base salary of $425,000 for that same year. In 2004, Serrao sold shares equivalent to nearly one third of his holdings as of the beginning of the Class Period, reaping profits in excess of $4 million, 10 times his base salary of $400,000 for that same year and approximately six times his total salary and bonus of $624,000 for that year.

| SALE DATE | NO. OF SHARES SOLD | NET PROFITS |
|---|---|---|
| 03/10/04 | 5,000 | $81,450 |
| 03/10/04 | 1,200 | $19,404 |
| 03/11/04 | 1,500 | $24,435 |
| 03/11/04 | 500 | $8,085 |
| 03/11/04 | 3,000 | $48,570 |
| 03/11/04 | 5,000 | $81,050 |
| 05/14/04 | 4,000 | $65,760 |
| 05/14/04 | 8,900 | $145,871 |
| 05/13/04 | 20,000 | $324,400 |
| 05/10/04 | 2,700 | $45,036 |
| 05/10/04 | 2,300 | $38,502 |
| 05/10/04 | 2,100 | $34,734 |
| 05/07/04 | 10,000 | $159,900 |
| 05/07/04 | 2,500 | $39,875 |
| 05/07/04 | 4,300 | $68,241 |
| 05/07/04 | 3,200 | $50,784 |
| 09/13/04 | 1,000 | $17,420 |
| 09/14/04 | 60,000 | $1,030,200 |
| 11/12/04 | 2,500 | $44,200 |
| 11/12/04 | 7,500 | $130,665 |
| 11/12/04 | 10,000 | $174,020 |
| 11/15/04 | 8,600 | $149,072 |
| 11/15/04 | 400 | $6,876 |
| 11/16/04 | 1,600 | $27,632 |
| 11/17/04 | 10,000 | $171,730 |
| 11/18/04 | 10,000 | $174,400 |
| 11/19/04 | 19,400 | $333,292 |
|  |  |  |
| 03/04/05 | 2,000 | $46,600 |
| 03/04/05 | 4,470 | $104,307 |
| 03/04/05 | 500 | $11,626 |
| 03/07/05 | 3,600 | $81,612 |
| 03/09/05 | 2,000 | $43,540 |
| 03/09/05 | 14,000 | $302,120 |

| SALE DATE | NO. OF SHARES SOLD | NET PROFITS |
|---|---|---|
| 03/14/05 | 2,700 | $61,209 |
| 11/01/05 | 14,400 | $177,653 |
| 11/01/05 | 37,500 | $593,888 |
| 11/01/05 | 16,100 | $258,465 |
| 11/02/05 | 1,500 | $24,818 |
| 11/02/05 | 8,500 | $137,761 |
| 11/02/05 | 20,000 | $328,452 |
| 11/02/05 | 10,000 | $165,000 |
| 11/03/05 | 5,000 | $83,750 |
| 11/03/05 | 27,000 | $445,500 |
|  |  |  |
| 03/13/07 | 12,244 | $190,027 |
| 03/14/07 | 21,370 | $326,106 |
| 03/15/07 | 7,300 | $111,845 |
| 03/16/07 | 9,586 | $146,522 |
| 03/16/07 | 4,971 | $73,496 |
| 05/03/07 | 15,968 | $333,564 |
| 05/03/07 | 1,281 | $20,380 |
| 05/04/07 | 3,600 | $72,429 |
| 05/07/07 | 700 | $13,843 |
| 05/07/07 | 26,669 | $527,406 |
| 05/07/07 | 13,758 | $261,622 |
| 05/08/07 | 38,024 | $734,281 |
|  |  |  |
| **TOTAL** | **565,741** | **$9,719,973** |

165.    Not only were Serrao's stock sales unusually large in absolute terms, they were also suspiciously timed. Between 2001 and February 25, 2008, Serrao did not sell any shares of his ADPI stock. Then, from March 2004 through November of 2004, Serrao sold 241,000 shares, coinciding with his increasing unannounced visits to Park Dental clinics where he openly disparaged PDG's leadership, and PDHC and ADPI's increased efforts to usurp control from PDG. Following that, between March 2007 and May 2007, Serrao sold another 155,471 shares, again conveniently timed to coincide with the period during which, unbeknownst to investors, ADPI and PDHC were taking steps to abandon the Service Agreement, interfering with PDG's efforts to relocate to new clinics, and engaging in other unlawful conduct.

166. Serrao's sales were also suspiciously timed in another respect. In 2007, all of Serrao's sales of shares came from the exercise by Serrao of options which were not close to expiration. This was contrary to his trading practice at earlier points, where he was exercising options that were about to expire. For example, Serrao exercised options in late 2004 and early 2005 that were set to expire within a short period of time (between 4 and 8 months). Yet, later in 2005 he began exercising options with expiration dates that were much further into the future, ranging from 14 months to 5 years from the date of exercise. In fact, he exercised options on May 7 and May 8 of 2005 that would not have expired for more than six more years. Those two transactions—long before the expiration of those options, and much earlier than had been past practice—netted Serrao approximately $1 million.

167. Similarly, Defendant Feigh exercised stock options and sold 22,563 ADPI shares in February, March and May of 2007, equivalent to approximately 23.4% of his beneficial holdings of 96,257 shares (according to the numbers disclosed in ADPI's March 31, 2004 Proxy Statement), and received more than $400,000 in profits from those sales, as shown in the table below. In 2007, a year in which Feigh received approximately $700,000 in regular compensation and bonuses, the profits from Feigh's stock sales increased his compensation that year by more than half.

| SALE<br>DATE | NO. OF<br>SHARES SOLD | NET<br>PROFITS |
|---|---|---|
| 02/20/07 | 200 | $3,084 |
| 03/16/07 | 4,863 | $73,772 |
| 03/16/07 | 1,400 | $21,518 |
| 03/16/07 | 3,600 | $55,338 |
| 03/16/07 | 565 | $8,673 |
| 03/16/07 | 1,935 | $29,683 |
| 05/03/07 | 5,000 | $102,350 |
| 05/10/07 | 5,000 | $113,100 |
| | | |
| **TOTAL** | **22,563** | **$407,518** |

168.    Like Serrao, Feigh's timing was not merely coincidental: Feigh sold shares of APDI between February and May of 2007 after ADPI determined it would sever its relationship with PDG, but was still reassuring the market that it would honor the Service Agreement.

169.    *Fifth*, Defendants had a substantial financial motive to improperly inflate ADPI's revenues and earnings in order to maintain or improve ADPI's standing with its creditors. During the year ended December 31, 2006, the revenues from the PDG affiliation accounted for 29% of the $217,917,000 in revenues received by ADPI, or approximately $63 million. As of the same period, ADPI had $33,700,000 outstanding in a revolving credit line. According to ADPI, the Company was able to "amend the credit facility as a result of favorable credit markets and our improved financial position...." (emphasis added). Defendants further acknowledged that "[ADPI is] also required to comply with financial and other covenants, including minimum net worth, leverage and fixed charge ratios and maximum capital expenditures as defined by the credit agreement. [ADPI is] in compliance with [its] covenants as of December 31, 2006." By engaging in the fraudulent conduct and inflate ADPI's earnings and performance, Defendants were able to amend the Company's outstanding credit facility as well as maintain compliance with the Company's debt covenants.

## APPLICABILITY OF THE FRAUD-ON-THE-MARKET DOCTRINE

170.    At all relevant times, the market for ADPI's common stock was an efficient market for the following reasons, among others:

> a.   ADPI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> b.   During the Class Period, the average weekly trading volume of ADPI's stock was greater than two percent of the outstanding shares, justifying a strong presumption that the market for ADPI shares was efficient;
>
> c.   As a regulated issuer, ADPI filed periodic public reports with the SEC and the NASDAQ;

d. ADPI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. ADPI was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

f. There was a cause-and-effect relationship between unexpected corporate events or financial releases and movements in the stock price; and

g. ADPI was eligible to register its stock pursuant to a Form S-3 registration statement. In fact, ADPI registered approximately 2.6 million shares pursuant to a Form S-3 registration statement dated March 31, 2004.

171. As a result of the foregoing, the market for ADPI's common stock promptly digested current information regarding ADPI from all publicly-available sources and reflected such information in ADPI's stock price. Under these circumstances, Plaintiffs are entitled to a presumption of reliance upon the integrity of the market for ultimate proof of its claims on the merits. Plaintiffs will also rely, in part, upon the presumption of reliance established by material omissions and upon its actual reliance on Defendants' false and misleading statements.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

172. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ADPI who knew that those statements were false when made.

## COUNT I

### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5

173.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

174.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5b promulgated thereunder against all Defendants.

175.    As alleged in this Complaint, throughout the Class Period, the Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. Among other things, ADPI's SEC filings, press releases and conference calls with investors all contained materially false and misleading statements of fact and/or omitted material facts as detailed above.

176.    The Defendants' false and misleading statements and omissions were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate and maintain the market price of ADPI's securities; and (iii) cause Plaintiffs to purchase ADPI's securities at inflated prices.

177.    The Defendants were each individually and collectively responsible for making one or more of the statements and omissions alleged herein, by virtue of having prepared, reviewed, commented on, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein

-66-

not misleading, or by virtue of having made false or misleading verbal statements during ADPI's conference calls with investors.

178. As described above, the Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs.

179. The Defendants' false statements and omissions were made in connection with the purchase or sale of ADPI's securities.

180. In ignorance of the false and misleading nature of the Defendants' statements and omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for ADPI's securities, Plaintiffs purchased ADPI's securities at artificially inflated prices. But for the fraud committed by the Defendants, Plaintiffs would not have purchased the securities at artificially inflated prices.

181. The market price for ADPI's securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

182. Plaintiffs were substantially damaged as a direct and proximate result of their purchases of ADPI's securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT II

### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT BY THE INDIVIDUAL DEFENDANTS

183. Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

184. This Claim is brought on behalf of Plaintiffs against the Individual Defendants, pursuant to Section 20(a) of the Exchange Act.

185.    The Individual Defendants and each of them acted as controlling persons of ADPI within the meaning of Section 20(a) of the Exchange Act. By virtue of their executive positions, and/or position on ADPI's Board of Directors, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of ADPI, including the content and dissemination of the various statements that Plaintiffs contend are materially false and misleading. The Individual Defendants were provided with or had unlimited access to copies of ADPI's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

186.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of ADPI and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged in this Complaint, especially because of their senior positions, and exercised the same.

187.    As set forth above, ADPI violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged herein. As a direct and proximate result of ADPI's wrongful conduct, Plaintiffs suffered damages. By virtue of their positions as controlling persons of ADPI, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act for ADPI's violations of Section 10(b) and Rule 10b-5.

## COUNT III

### VIOLATION OF SECTION 18 OF
### THE EXCHANGE ACT

188.    Plaintiffs repeat and reallege each and every allegation as if set forth fully herein.

189.    This is a claim against ADPI and the Individual Defendants. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of

strict liability and/or negligence under Section 18 of the Securities Exchange Act, 15 U.S.C. §78(r).

190.    As set forth in Exhibit A hereto, Plaintiffs acquired ADPI stock on the open market after reading and reviewing and actually relying upon documents filed by ADPI with the SEC pursuant to the Securities and Exchange Act of 1934 ("1934 Act Documents"). When Plaintiffs acquired ADPI stock, Plaintiffs read, reviewed and actually relied upon the false and misleading statements contained in the 1934 Act documents it relied upon in connection with its purchases, including:

| | |
|---|---|
| March 17, 2004 Form 10-K | November 12, 2004 Form 10-Q |
| May 13, 2004 Form 10-Q | March 14, 2005 Form 10-K |
| August 11, 2004 Form 10-Q | May 9, 2005 Form 10-Q |
| November 9, 2005 Form 10-Q | August 19, 2005 Form 10-Q |
| May 9, 2007 Form 10-Q | March 10, 2006 Form 10-K |
| August 9, 2007 Form 10-Q | May 9, 2006 Form 10-Q |
| November 9, 2007 Form 10-Q | August 9, 2006 Form 10-Q |
| | November 8, 2006 Form 10-Q |
| | March 9, 2007 Form 10-K |

ADPI and each of the Individual Defendants made, or caused to be made, false and misleading statements, as alleged above, in each of the above-referenced 1934 Act documents. Moreover, each of the Individual Defendants signed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (the "Certifications") and attached and incorporated such Certifications in such 1934 Act filings.

191.    Plaintiffs actually read, reviewed and relied on the false and materially misleading statements contained in the 1934 Act Documents identified above in making the decision to purchase ADPI securities.

192.    In ignorance of the falsity of the statements contained in the 1934 Act Documents identified above, and after reading and actually relying thereon, Plaintiffs purchased ADPI securities in actual eyeball reliance upon ADPI's representations.

193.    ADPI's materially false and misleading statements contained in the 1934 Act documents identified above artificially inflated the price of ADPI securities.

194.    Had it known the true facts, Plaintiffs would not have purchased the ADPI securities and/or would not have purchased them at the inflated price.

195.    Upon disclosure of the true facts, the price of ADPI securities purchased by Plaintiffs dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

196.    By reason of the foregoing, ADPI and the Individual Defendants are liable to Plaintiffs for violation of Section 18 of the Exchange Act, 15 U.S.C. §78(r).

## PRAYER FOR RELIEF

197.    WHEREFORE, Plaintiff demands judgment:

A.    Awarding compensatory damages against Defendants in favor of Plaintiffs for damages sustained as a result of Defendants' wrongdoing;

B.    Awarding Plaintiffs their costs and disbursements in this suit, including reasonable attorneys' fees and expert fees; and

C.    Awarding such other relief as the Court deems just and proper.

## JURY DEMAND

198.    Plaintiffs hereby demand a trial by jury.

Dated:  February 23, 2010          Respectfully submitted,

O'Brien & White, Professional Corporation
Mark A. White BBO #525520
50 Congress Street, Suite 936
Boston, MA 02109
Tel.:  617-248-2345
Fax:  617-248-2328
*Counsel for Plaintiffs*

-70-