UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SPECIAL SITUATIONS FUND III, L.P., et al., | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 10-10331-JLT |
| AMERICAN DENTAL PARTNERS, INC., et al., | * * * | |
| Defendants. | * * * | |

MEMORANDUM

March 31, 2011

TAURO, J.

I.     Introduction

        In this action, Plaintiffs, Special Situations Fund III, L.P., Special Situations Cayman

Fund, L.P., and Special Situations Fund III QP, L.P. ("Plaintiffs"), accuse Defendants, American

Dental Partners, Inc. ("ADPI") and three of its corporate officers, Breht T. Feigh ("Feigh"),

Gregory A. Serrao ("Serrao"), and Mark W. Vargo ("Vargo") (collectively, "Defendants"), of

securities fraud.  Plaintiffs allege that all Defendants violated Section 10(b) of the Securities

Exchange Act of 1934 ("the Exchange Act"),[1] along with Rule 10b-5 promulgated thereunder,[2]

and Section 18 of the Exchange Act.[3]  Plaintiffs allege that Feigh, Serrao, and Vargo violated

---

[1] 15 U.S.C. § 78j(b).

[2] 17 C.F.R. 240.10b-5.

[3] 15 U.S.C. § 78r(a).

Section 20(a) of the Exchange Act.[4]  Presently at issue is Defendants' <u>Motion to Dismiss</u> [#5].

For the following reasons, the <u>Motion to Dismiss</u> [#5] is DENIED IN PART and ALLOWED IN

PART.  It is DENIED as to the Section 10(b) and Section 20(a) claims but ALLOWED as to the

Section 18 claim.

II        <u>Background</u>[5]

     Plaintiffs are investment partnerships that bought ADPI common stock between February

25, 2004 and December 13, 2007.[6]  Plaintiffs opted out of a class action suit alleging securities

fraud against Defendants and now bring this action individually.[7]  Plaintiffs purchased ADPI stock

in reliance upon public representations made by Defendants[8] that contained untrue statements of

material fact, or omitted material facts necessary to make the statements not misleading,[9] in

regards to the amount and source of ADPI's reported earnings, ADPI's conduct in fulfilling

contractual duties owed to a business partner, and the merits of pending litigation in which ADPI

---

[4] <u>Id.</u> § 78t.

[5] This court presents the facts as they appear in Plaintiffs' <u>Complaint</u>, and construes those facts in the light most favorable to Plaintiffs.  <u>Bielski v. Cabletron Sys., Inc. (In re Cabletron Sys., Inc.)</u>, 311 F.3d 11, 22 (1st Cir. 2002).

[6] Compl. ¶ 18, Ex. A [#1].

[7] Compl. ¶ 1 [#1]; <u>see</u> <u>In Re Am. Dental Partners, Inc. Sec. Litig.</u>, No. 08-10119-RGS, 2010 U.S. Dist. LEXIS 35074 (D. Mass. Apr. 9, 2010).  The class action involved claims under Section 10(b) and Rule 10b-5 and Section 20(a), but not under Section 18. Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss Compl., 8 [#10] [hereinafter Pls.' Mem. Opp'n].

[8] Compl. ¶ 18 [#1]

[9] Compl. ¶ 175 [#1].

was a party.[10]  The Complaint also alleges that Defendants' false and misleading statements and omissions were intended to deceive the investing public and artificially inflate and maintain the market price of ADPI securities.[11]  Plaintiffs suffered a substantial loss as a result of these transactions.[12]

A.      The Underlying Dispute[13]

In 1995, Serrao founded ADPI as a management service organization.[14]  In return for a fee, ADPI provided managerial and administrative support to dental practices.[15]  Contracting with ADPI freed dentists of certain duties related to operating a business, allowing the dentists to focus exclusively on the dental aspects of their practices.[16]

In 1996, ADPI arranged for a wholly owned subsidiary, PDHC, Ltd., (ADPI and PDHC, Ltd. are referred to collectively hereinafter as "ADPI") to sign a forty-year agreement (the "Service Agreement") with a Minnesota dental practice known as the Park Dental Group ("PDG").[17]  The Service Agreement governed the business relationship between ADPI and

---

[10] See Compl. ¶¶ 91–145 [#1].

[11] Compl. ¶ 176 [#1].

[12] Compl. ¶ 18 [#1].

[13] The following facts underlie both the complaint in the class action (the "class complaint") and Plaintiffs' Complaint.

[14] Compl. ¶ 3 [#1].

[15] Compl. ¶ 4 [#1].

[16] Compl. ¶ 3 [#1].

[17] Compl. ¶ 5 [#1].

PDG.[18]

The affiliation with PDG was ADPI's first.[19]  ADPI duplicated the arrangement with other dental practices around the country.[20]  This business model proved successful, at least initially.[21]  In 1998, ADPI conducted an initial public offering ("IPO").[22]  On the day of its IPO, ADPI stock closed at $11.67 per share on a split-adjusted basis.[23]  But declining growth took a toll on ADPI's share price.[24]  By late 2001, ADPI stock was trading at under $3.00 per share on a split-adjusted basis.[25]  Throughout the entire relevant period, ADPI's affiliation with PDG was ADPI's largest management service contract.[26]  The affiliation produced approximately thirty percent of ADPI's revenue and earnings.[27]

To address ADPI's declining share price, Defendants began a course of conduct that involved multiple breaches of the Service Agreement and misleading the public about the nature

---

[18] Compl. ¶¶ 35–42 [#1].

[19] Compl. ¶ 5 [#1].

[20] Compl. ¶ 6 [#1].

[21] See Compl. ¶¶ 6–7 [#1].

[22] Compl. ¶ 33 [#1].

[23] Compl. ¶ 33 [#1].

[24] See Compl. ¶¶ 43–47 [#1].

[25] Compl. ¶ 6 [#1].

[26] Compl. ¶ 69 [#1].

[27] Compl. ¶ 6 [#1].

of this conduct.[28]

First, Defendants began to knowingly divert to ADPI's treasury money that properly belonged to PDG under the terms of the Service Agreement.[29]  Defendants calculated the PDG dentists' total pay using a smaller percentage of revenue than the Service Agreement required.[30] Defendants improperly calculated the proportion of residual profit due to PDG after other expenses were subtracted from revenue.[31]  Defendants failed to apply yearly budgets retroactively in violation of past practice.[32]  Defendants "swept" money owed to ADPI by PDG out of PDG's bank account daily, as opposed to on the monthly or quarterly schedule provided in the Service Agreement, in order to ensure that the interest on the funds accrued to ADPI, instead of PDG.[33] Defendants improperly labeled certain expenses incurred by ADPI, including legal fees, as clinical expenses,[34] which, when labeled as such, received treatment favorable to ADPI under the Service Agreement.[35]  Defendants failed to pass on to PDG rebates that were received from vendors for

---

[28] See Compl. ¶¶ 48–66 [#1].

[29] Compl. ¶¶ 50–58 [#1].

[30] Compl. ¶ 51 [#1].  This practice occurred from 2002 until 2007.  Compl. ¶ 51 [#1].

[31] Compl. ¶¶ 53–55 [#1].  This practice occurred from 2005 until 2007.  Compl. ¶ 51 [#1].

[32] Compl. ¶ 52 [#1].  This practice occurred from 2005 until 2007.  Compl. ¶ 51 [#1].

[33] Compl. ¶ 56 [#1].  The Complaint does not specify the time period when this practice occurred.  Compl. ¶ 56 [#1].

[34] Compl. ¶ 57 [#1].  The Complaint does not specify the time period when this practice occurred.  See Compl. ¶ 57 [#1].

[35] Compl. ¶¶ 35-38 [#1].

the purchase of equipment and supplies.[36]  Between 2002 and 2007, ADPI employed these

practices to divert to itself more than $15,000,000 that properly belonged to its business partner,

PDG, under the terms of the Service Agreement.[37]  Throughout this period, ADPI reported this

money as legitimately earned profits.[38]

The second category of Service Agreement violations involve Defendants' attempts to

improve ADPI's financial numbers through cost-cutting measures at PDG, the implementation of

which entailed improper involvement by ADPI in clinical aspects of PDG's practice.[39]  Defendants

instructed ADPI's practice managers not to take directions from the PDG dentists, even though

the Service Agreement required all aspects of clinical practice to be supervised and directed by the

PDG dentists.[40]  Against the wishes of PDG's dentists, Defendants terminated the employment of

support staff, including "dental hygiene mentors" and "sterilization team members," whose duties

affected the quality of patient care at PDG's facilities.[41]  Defendants allowed inventory and

supplies to dwindle.[42]  Defendants reduced expenditures on equipment maintenance and repair.[43]

---

[36]  Compl. ¶ 57 [#1].  The Complaint does not specify the time period when this practice occurred.  See Compl. ¶ 57 [#1].

[37]  Compl. ¶¶ 50–58  [#1].

[38]  Compl. ¶ 49 [#1].

[39]  See Compl. ¶¶ 59–66 [#1].

[40]  Compl. ¶ 61 [#1].

[41]  Compl. ¶ 63 [#1].

[42]  Compl. ¶ 63 [#1].

[43]  Compl. ¶ 63 [#1].

Defendants interfered with the manner in which PDG dentists scheduled patients in order to maximize the number of patients treated.[44]  Defendants also developed and introduced policies that changed existing practices that organized and managed employees and that determined which payment plans were available to patients.[45]  Defendants did so without the approval of the "Policy Board" responsible for all policy changes under the terms of the Service Agreement.[46]

On February 3, 2006, PDG sued ADPI alleging breach of the Service Agreement, breach of fiduciary duty, breach of an implied covenant of good faith and fair dealing, and tortious interference.[47]  (The suit, and all associated counterclaims, are referred to hereinafter as the "PDG lawsuit.")  Among other remedies, PDG sought rescission of the Service Agreement.[48]  On March 28, 2007, PDG served ADPI with a "Notice of Termination" ending the Service Agreement effective December 31, 2007.[49]

By April 2007, ADPI had decided not to contest the termination of its relationship with PDG under the Service Agreement.[50]  Instead, APDI decided to install a new dental practice in

---

[44] Compl. ¶ 64 [#1].

[45] Compl. ¶¶ 60, 65 [#1].

[46] Compl. ¶¶ 60, 65 [#1].

[47] Compl. ¶ 67 [#1].

[48] Compl. ¶ 67 [#1].

[49] Compl. ¶ 74 [#1].

[50] Compl. ¶¶ 74–76 [#1].

the PDG offices.[51]  ADPI attempted to hire PDG dentists to staff the new practice.[52]  ADPI also

interfered with PDG's attempts to establish a new office location by pressuring vendors not to

deal with PDG and by withholding patient records that belonged to PDG.[53]

On December 12, 2007, after a one-month jury trial in the fourth Judicial District Court,

County of Hennepin, Minnesota, the jury decided the PDG lawsuit with a verdict in favor of

PDG.[54]  The jury awarded PDG compensatory damages totaling $88,290,647.[55]  The jury found

that ADPI had breached the Service Agreement, breached the implied covenant of good faith and

fair dealing, breached its fiduciary duty to PDG, tortiously interfered with PDG's contractual

relationships with its dentists, and tortiously interfered with PDG's attempts to set up its new

practice.[56]  On this news, ADPI's stock fell from a closing price of $19.70 on December 11, 2007

to $14.34 at the close of December 12, 2007.[57]

On December 13, 2007, the jury returned another verdict in favor of PDG, this time

awarding PDG punitive damages.[58]  The jury awarded $21.125 million in punitive damages to

--------

[51] Compl. ¶ 76 [#1].

[52] Compl. ¶¶ 77–78 [#1].

[53] Compl. ¶¶ 87–89 [#1].

[54] Compl. ¶ 146 [#1]; Pls.' Mem. Opp'n, 13 [#10].

[55] Compl. ¶ 146 [#1].

[56] Compl. ¶ 146 [#1].

[57] Compl. ¶ 147 [#1].

[58] Compl. ¶ 148 [#1].

PDG for ADPI's tortious interference with PDG's relationship with its dentists, finding that ADPI had acted "with deliberate disregard for the rights of PDG."[59] The jury awarded another $21.125 million in punitive damages to PDG for ADPI's tortious interference with PDG's attempts to establish a new practice, finding that, in this regard as well, ADPI had acted "with deliberate disregard for the rights of PDG."[60] On this news, ADPI's stock fell to a close of $4.62 on December 13, 2007.[61] The total compensatory and punitive damages awarded to PDG were more than $130 million.[62]

The class action securities fraud allegations mentioned above followed shortly thereafter, ending in settlement.[63] The Plaintiffs opted out of that suit.[64]

B.    Defendants' Alleged Misrepresentations

Underlying the securities fraud claims, Plaintiffs allege roughly fifty instances in which Defendants made untrue statements of material fact or omitted material facts necessary to make certain statements that they made not misleading.[65] The misrepresentations can be grouped into four general categories.

---

[59] Compl. ¶ 148 [#1].

[60] Compl. ¶ 148 [#1].

[61] Compl. ¶ 148 [#1].

[62] See Compl. ¶ 148 [#1].

[63] Pls.' Mem. Opp'n, 7 [#10].

[64] Compl. ¶ 1 [#1]; Pls.' Mem. Opp'n, 7–8 [#10].

[65] See Compl. ¶¶ 91–145 [#1].

The first category of misrepresentations includes quarterly and yearly earnings reports and

press releases made between February 2004, and November 2007, which report inflated earnings

numbers and attribute ADPI's growth to legal business practices.[66]  Such statements are allegedly

---

[66] See Compl. ¶ 92 [#1] (citing a press release, dated February 25, 2004, attached to a
Form 8-K filed by Feigh); Id. ¶ 93 (citing a Form 10-K, filed March 17, 2004); Id. ¶ 94 (citing a
press release, dated May 3, 2004, attached to a Form 8-K signed by Feigh); Id. ¶ 95 (citing a
press release, dated May 3, 2004, in which Serrao praised strong financial performance and
explained that efforts were focused on "improving our internal, same market growth rates"); Id.
¶ 96 (citing a Form 10-Q, filed May 13, 2004, signed by Serrao and Feigh); Id. ¶ 97 (citing a press
release, dated August 2, 2004, attached to a Form 8-K filed by Feigh); Id. ¶ 98 (citing a Form
10-Q, filed August 11, 2004, signed by Serrao and Feigh, stating that increase in total revenue
was primarily the result of "growth at our existing affiliated dental groups"); Id. ¶ 99 (citing a
press release, dated November 1, 2004, attached to a Form 8-K signed by Feigh); Id. ¶ 100 (citing
a Form 10-Q, filed November 12, 2004, signed by Serrao and Feigh); Id. ¶ 101 (citing a press
release, dated February 23, 2005, attached to a Form 8-K signed by Feigh); Id. ¶ 102 (citing a
press release, dated February 23, 2005); Id. ¶ 103 (citing a Form 10-K, filed on March 14, 2005,
signed by Serrao and Feigh); Id. ¶ 104 (citing a press release, dated April 27, 2005, attached to a
Form 8-K); Id. ¶ 105 (citing a Form 10-Q, dated May 9, 2005, signed by Serrao and Feigh); Id.
¶ 106 (citing a Form 10-Q, dated May 9, 2005, stating that the increase in ADPI's net revenue
"was attributable to same market net revenue growth from our affiliated dental group practices
. . . and incremental net revenue earned from our platform affiliation completed in February 2005,
offset by a decrease in other revenue . . . primarily attributable to a decrease in dental laboratory
fees as a result of an increasing percentage of fees being earned from our affiliated dental
groups"); Id. ¶ 107 (citing a press release, dated July 27, 2005, attached to a Form 8-K); Id. ¶ 108
(citing a Form 10-Q, filed August 9, 2005, signed by Serrao and Feigh); Id. ¶ 109 (citing a press
release, dated October 26, 2005, attached to a Form 8-K); Id. ¶ 110 (citing a Form 10-Q, dated
November 9, 2005, signed by Serrao and Feigh); Id. ¶ 112 (citing a press release, dated February
22, 2006, attached to a Form 8-K); Id. ¶ 113 (citing a press release, dated February 22, 2006,
attributing the increase in net earnings to "growth and innovation" including reinvestment in
"capital expenditures and additional inmarket [sic] affiliations for the benefit of our affiliated
dental group practices"); Id. ¶ 115 (citing a Form 10-K, filed March 10, 2006, signed by Serrao
and Feigh); Id. ¶ 116 (citing a Form 10-K, filed March 10, 2006, stating that the increase in net
revenue from 2003 to 2004 was "attributable to . . . increase in same market net revenue growth
and incremental net revenue earned from our platform affiliation"); Id. ¶ 117 (citing a press
release, dated May 1, 2006, attached to a Form 8-K, signed by Feigh); Id. ¶ 118 (citing a Form
10-Q, filed May 9, 2006, signed by Serrao and Feigh); Id. ¶ 120 (citing a press release, dated July
31, 2006, attached to a Form 8-K signed by Feigh); Id. ¶ 122 (citing a Form 10-Q, filed August 9,
2006, stating that the increase in net revenue and net earnings during second quarter and first half
of 2006 were primarily due to same market net revenue growth at the affiliated dental groups,
while salaries and benefits as a percentage of net revenue decreased "due to increase productivity

false and misleading because Defendants represented the financial results as legitimately obtained and accrued according to generally accepted accounting principles, when in fact a substantial amount of ADPI's earnings and revenues constituted money that ADPI wrongfully diverted to itself from PDG through breaches of the Service Agreement.[67]

The second category of misrepresentations includes statements that Defendants made in publicly filed documents, in press releases, and on conference calls, to the effect that the claims alleged against ADPI in the PDG lawsuit were baseless and without merit.[68]  Such statements are

---

at the affiliated dental groups" and that ADPI's "growth to date has resulted in large measure from our ability to affiliate with additional dental practices"); Id. ¶ 124 (citing a Form 8-K, filed October 30, 2006, signed by Feigh); Id. ¶ 126 (citing a press release, dated February 21, 2007, attached to a Form 8-K signed by Feigh); Id. ¶ 129 (citing a Form 10-K, filed March 9, 2007, attributing ADPI's growth to legal sources of income); Id. ¶ 132 (citing a press release, dated April 30, 2007, attached to a Form 8-K); Id. ¶ 134 (citing a Form 10-Q, filed May 9, 2007, attributing ADPI's increase in revenue to legal sources, including "improved facility utilization, . . . acquisitions . . . and leveraging of other operating and general corporate expenses"); Id. ¶ 135 (citing a press release, dated July 30, 2007, signed by Feigh); Id. ¶ 136 (citing a conference call, undated, regarding second quarter 2007 financial results, ascribing "strong same-market revenue growth and improved operating margins" to affiliated dental groups and describing "robust" "corporate development activities"); Id. ¶ 138 (citing a Form 10-Q, filed August 9, 2007, attributing net revenue growth to platform acquisitions and affiliations, revenue growth from affiliated dental groups, and other legal sources); Id. ¶ 139 (citing a press release, dated October 29, 2007, attached to a Form 8-K, signed by Feigh).

[67] See Compl. ¶ 144 [#1].

[68] See Compl. ¶ 111 [#1] (citing a press release, dated February 6, 2006, attached to a Form 8-K, stating, in reference to the PDG lawsuit, that the "allegations are baseless and without merit" and that "[t]he Company further believes that the relationship between [ADPI] and PDG, including the terms of the Service Agreement, is in compliance with applicable laws"); Id. ¶ 114 (citing a conference call on February 23, 2006, during which Serrao stated that ADPI had reviewed the complaint and "believe[s] the allegations are baseless and without merit" and that ADPI viewed the "lawsuit as a means to an end, a desire by the directors of PDG to undo a transaction that was fairly negotiated and structured between two parties nearly 10 years ago"); Id. ¶ 118 (citing a Form 10-Q, filed May 9, 2006, stating that ADPI "believes the claims made by PDG are baseless"); Id. ¶ 119 (citing a conference call on May 2, 2006, during which Serrao stated that "the directors of PDG wish to undo a transaction that was fairly negotiated and

allegedly materially false and misleading because Defendants knew that their conduct had

breached the Service Agreement and that the PDG lawsuit did, therefore, have merit.[69]

The third category of misrepresentations includes statements that Defendants made to the

effect that their conduct toward PDG in fulfilling its duties under the Service Agreement had not

changed during the course of the relationship.[70]  Such statements are allegedly materially false and

misleading because Defendants knew they had departed from practices that were in place at the

---

structured between the parties through a complaint that contains claims that are without merit");
Id. ¶ 121 (citing a Form 10-Q, filed on August 9, 2006, stating that ADPI "believes the claims
made by PDG are baseless"); Id. ¶ 125 (citing a Form 10-Q, filed November 8, 2006, stating that
ADPI "believes the claims made by PDG are baseless"); Id. ¶ 127 (citing a conference call on
February 22, 2007, during which Serrao stated that, with respect to the PDG lawsuit, "[i]t is our
continuing belief that the allegations contained in the complaint are baseless and without merit
and, as such, we have been defending and intend to continue defending ourselves vigorously"); Id.
¶ 128 (citing a Form 10-K, filed March 9, 2007, stating that ADPI "believes the claims made by
PDG are baseless"); Id. ¶ 130 (citing a press release, dated April 3, 2007, attached to a Form 8-K,
stating that "PDG would have significant legal exposure if it attempts to terminate the Service
Agreement without first proving in court a material breach of the agreement by [ADPI]"); Id.
¶ 133 (citing a Form 10-Q, filed May 9, 2007, stating that ADPI "believes the claims made by
PDG are baseless"); Id. ¶ 137 (citing a Form 10-Q, filed August 9, 2007, stating that ADPI
"believes PDG's claims in the PDG Complaint and PDG's counterclaims in the [ADPI] Complaint
are baseless"); Id. ¶ 141 (citing a Form 8-K, dated Oct. 30, 2007, stating that ADPI believes that
"PDG's claims in the PDG Complaint and PDG's counterclaims in the [ADPI] complaint are
baseless and without merit"); Id. ¶ 142 (citing a Form 10-Q, filed November 9, 2007, stating that
ADPI "believes PDG's claims . . . are baseless and without merit"); Id. ¶ 143 (citing a Form 10-Q,
filed November 9, 2007, stating that "Our growth to date has resulted in large measure from our
ability to affiliate with additional dental practices").

   [69] See Compl. ¶ 144 [#1].

   [70] See Compl. ¶ 111 [#1] (citing a press release, dated February 6, 2006, attached to a
Form 8-K, stating, in reference to the PDG lawsuit, that "the Company conducts its business at
Park Dental today as it has since entering into the affiliation with PDG nine years ago and intends
to continue to do so"); Id. ¶ 131 (citing a conference call on April 4, 2007, during which Serrao
stated that there had been no changes to the way ADPI had executed its obligations under the
Service Agreement, and that ADPI would "continue to operate [the] Park Dental business
consistent with the service agreement and past practices" (alteration in original)).

start of the affiliation.[71]

The fourth category of misrepresentations includes statements made by ADPI concerning ADPI's proposed business plan to continue operating the PDG clinics without PDG's dentists.[72] These statements are allegedly materially false and misleading because they failed to disclose that the plan was subject to heightened legal risk, dependent on unlawful conduct by ADPI, and otherwise unworkable.[73]

## III.  Discussion

Pursuant to Rules 12(b) and 9(b) of the Federal Rules of Civil Procedure, Defendants have moved for dismissal for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity.  The Private Securities Litigation Reform Act of 1995[74] ("PSLRA") also imposes heightened pleading requirements for private securities litigation.

### A.  Standard of Review

In addressing a motion to dismiss, a court must accept all well-pleaded facts in a complaint

---

[71] See Compl. ¶ 144 [#1].

[72] See Compl. ¶ 123 [#1] (citing a conference call on August 1, 2006, in which, asked by an analyst if two new affiliations with dental practices in Minnesota were in compliance with the Service Agreement with PDG, Serrao stated that ADPI had been approached by "a couple of doctors who have a desire to build a dental group practice and didn't want to do it entirely on their own" when in fact ADPI had approached these doctors); Id. ¶ 140 (citing a press release, dated October 29, 2007, stating that ADPI would no longer be affiliated with PDG after December 31, 2007, but that APDI "has entered into a new affiliation with a Minnesota professional limited liability company" and that ADPI "intends to continue to operate its Park Dental business with this Minnesota affiliated practice effective January 1, 2008").

[73] See Compl. ¶ 144 [#1].

[74] 15 U.S.C. § 78u-4.

as true.[75]  In so doing, a court may include in its analysis documents incorporated into a complaint by reference and matters of which it may take judicial notice.[76]  Although a court draws all reasonable inferences in a plaintiff's favor,[77] a court need not credit a complaint's "bald assertions" or "legal conclusions."[78]  Dismissal pursuant to Rule 12(b)(6) is appropriate if a complaint "fail[s] to state a claim upon which relief can be granted."[79]  To state a claim, a complaint must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."[80]  Dismissal under Rule 9(b) is appropriate if a complaint does not "state with particularity the circumstances constituting fraud."[81]

     In addition, the PSLRA requires private litigants alleging securities fraud to meet "heightened pleading requirements."[82]  First, a plaintiff must identify specifically the material misrepresentations or omissions underlying the claim of fraud.[83]  If the allegations are based on

---

[75] See ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008).

[76] See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

[77] See ACA Fin., 512 F.3d at 59.

[78] See Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996) (citations and internal quotation marks omitted).

[79] Fed. R. Civ. P. 12(b)(6).

[80] Glassman, 90 F.3d at 628 (citations and internal quotation marks omitted).

[81] Fed. R. Civ. P. 9(b).

[82] Miss. Pub. Emps.' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008).

[83] 15 U.S.C. § 78u-4(b)(1)(B).

information and belief, a complaint must "state with particularity all facts on which that belief is formed."[84] Second, a plaintiff must allege facts with sufficient particularity to create a strong inference that defendant acted with the scienter required as an element of the claim at issue.[85]  If a complaint does not plead actionable misstatements or fails to create a strong inference of the required scienter, a complaint must be dismissed.[86]

> B.    The Adequacy of the "Borrowed" Complaint

Defendants argue that the Complaint should be dismissed because, in preparing it, Plaintiffs copied from the class complaint.[87]  Defendants contend that, because the Complaint, on its face, is based on information and belief,[88] and because Plaintiffs, by their own admission, copied the allegations directly from the class complaint,[89] the Complaint does not satisfy the

---

[84] Id.

[85] Id. § 78u-4(b)(2); see Brody v. Stone & Webster, Inc. (In re Stone & Webster, Inc., Sec. Litig.), 414 F.3d 187, 199 (1st Cir. 2005) (explaining that "the Complaint must allege facts supporting a strong inference of whatever state of mind on the part of the defendant must be proved as an element of the claim").

[86] 15 U.S.C. § 78u-4(b)(3)(A).  The PSLRA's heightened standards for pleading actionable misstatements with specificity applies equally to Section 10(b), Section 18, and Section 20(a) claims.  Brody, 414 F.3d at 195.  The PSLRA's heightened standard for pleading facts giving rise to a strong inference of scienter applies to Section 10(b) claims, but does not apply to Section 18 or Section 20(a) claims.  Id. at 195–96 (explaining that "§§ 18 and 20(a) do not . . . require that the plaintiff prove that the defendant acted with any particular state of mind").

[87] Mem. Law Support Defs.' Mot. Dismiss, 10–12 [#6] [hereinafter Defs.' Mem. Law].

[88] Compl. ¶ 2 [#1].

[89] See Pls.' Mem. Opp'n, 13 [#10].

pleading requirements of the PSLRA.[90] According to Defendants, a complaint based on information and belief does not—and cannot— "state with particularity all facts on which that belief is formed" if it simply repeats the unproven allegations from another party's complaint.[91]

This court does not agree that a copied complaint is inherently fatal to an action. A complaint copied directly from another complaint can survive dismissal, even in light of the PSLRA and its heightened pleading requirements.[92] In Xcelera, dismissal was inappropriate because the complaint, though copied from a complaint in another action, was not based only on "bald assertions," or "documents which [Plaintiffs had] not bothered to read."[93] The plaintiffs there offered a list of "investigative sources . . . used to verify the contents of the earlier complaint."[94] Additionally, the complaint "identif[ied] and quote[d] from supporting documentation" including "press releases, annual reports, and agreements" between the parties.[95]

Assuming the PSLRA's other requirements for pleading on the basis of 'information and belief' are met, this court will not dismiss the Complaint merely because it is copied. Here, Plaintiffs have met the criteria for "information and belief" pleading under the PSLRA. First,

---

[90] Defs.' Mem. Law, 9 [#6].

[91] Defs.' Mem. Law, 9 [#6].

[92] See In re Xcelera.com Sec., No. 00-CV-11649-RWZ, 2002 U.S. Dist. LEXIS 7400, at *7–8 (D. Mass. Mar. 8, 2002).

[93] Id. at *7 (citations and internal quotation marks omitted).

[94] Id.

[95] Id. Even so, the "the duty to plead fraud with particularity is not satisfied by a generic claim that the pleading is based on investigation of counsel." Id. (citations and internal quotation marks omitted).

Plaintiffs have identified six different sources used in investigating their claim[96]: (a) testimony and documents from the PDG lawsuit, including transcripts of the sworn deposition and trial testimony of numerous witnesses, including Serrao;[97] (b) ADPI's filings with the Securities and Exchange Commission ("SEC");[98] (c) reports of securities analysts and investor advisory services;[99] (d) transcripts of ADPI's press conferences and conference calls with investors and analysts;[100] (e) publicly available press releases, published interviews, news articles, and other media reports disseminated by or concerning Defendants and related parties;[101] and (f) documents from the class action lawsuit from which Defendants opted out.[102]  Nor have Plaintiffs presented bald assertions.  Where appropriate, Plaintiffs have identified the specific individual who served as the source of a particular assertion in the Complaint.[103]  Similarly, where appropriate, Plaintiffs have identified the press releases, conference call transcripts, or SEC filings that support their allegations.[104]  The investigation conducted through the above-listed sources, coupled with the

---

[96] Compl. ¶ 2 [#1].

[97] Compl. ¶ 2 [#1].

[98] Compl. ¶ 2 [#1].

[99] Compl. ¶ 2 [#1].

[100] Compl. ¶ 2 [#1].

[101] Compl. ¶ 2 [#1].

[102] Compl. ¶ 2 [#1].

[103] See, e.g., Compl. ¶ 52 [#1] (referring to the testimony of "Michael Kenneally"); Compl. ¶ 56 [#1] (referring to the testimony of "David Nelson"); Compl. ¶ 62 [#1] (referring to the testimony of "Dr. Gulon").

[104] See, e.g., Compl. ¶¶ 92–141 [#1].

identification within the <u>Complaint</u> of the specific sources supporting the allegations, are sufficiently particular to satisfy the pleading requirements of the PSLRA for a complaint based on information and belief. The <u>Complaint</u>, purloined as it may be, is satisfactory.

      C.    <u>The Applicability of Stare Decisis</u>

Plaintiffs argue that, because their <u>Complaint</u> copies the class complaint, Judge Stearns's denial of the motion to dismiss the class complaint is a sufficient reason, by itself, for this court to deny the <u>Motion to Dismiss</u>.[105] Plaintiffs argue that stare decisis requires this court to defer to Judge Stearns's decision.[106] Defendants disagree, arguing that when Plaintiffs opted out of the class action, they opted out of receiving the benefits of any of Judge Stearns's rulings in that proceeding.[107]

This court agrees with Defendants on this issue. Plaintiffs' assertion that this court must defer to Judge Stearns's ruling reflects a misapprehension of the sources and application of stare decisis. District court opinions do not establish precedent.[108] District courts are not bound to follow the decisions of other district courts.[109] Rather, district court opinions "are binding only on the parties under principles of res judicata and even the . . . judge who authored them is not

---

[105] Pls.' Mem. Opp'n, 8–9 [#10].

[106] Pls.' Mem. Opp'n, 8–9 [#10].

[107] Defs.' Mem. Law, 16 [#6].

[108] <u>Vertex Surgical, Inc. v. Paradigm Biodevices, Inc.</u>, 648 F. Supp. 2d 226, 231 (D. Mass 2009) ("[D]istrict court decisions are neither authoritative nor precedential." (citations omitted)).

[109] <u>See</u> <u>id.</u>

otherwise obligated, except in service of a seemly consistency, to follow them in later cases."[110] This court is not required to defer to Judge Stearns's decision. Rather, it is the duty of this court to conduct its own analysis of the issues raised in the <u>Motion to Dismiss</u>.

### D. The Securities Fraud Claims

#### 1. Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5 of the Exchange Act, Plaintiffs must plead "six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."[111] Defendants have challenged the adequacy of Plaintiffs' pleading in regards to three of the required elements: a material misrepresentation or omission,[112] scienter,[113] and loss causation.[114] This court addresses each challenged element in turn.

#### a. Material misrepresentation or omission

Defendants argue that the misrepresentations or omissions they are alleged to have made are not material.[115] First, Defendants argue that ADPI's publicly filed reported earnings are not

---

[110] <u>Id.</u>

[111] <u>ACA Fin.</u>, 512 F.3d at 58 (citing <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 341–42 (2005)).

[112] <u>See</u> Defs.' Mem. Law, 17–21 [#6].

[113] <u>See</u> Defs.' Mem. Law, 21–26 [#6].

[114] <u>See</u> Defs.' Mem. Law, 26–31 [#6].

[115] <u>See</u> Defs.' Mem. Law, 17 [#6]; <u>id.</u>, Ex. 15 (attaching "Memorandum of Law in Support of the Defendants' Motion to Dismiss the Consolidated Class Action Complaint" from the class action).

actionable misrepresentations, even if, as alleged, ADPI failed to disclose that some revenue was derived from ADPI's knowing breaches of the Service Agreement.[116] This is so, the argument goes, because a company has no duty to accuse itself of wrongdoing.[117] Second, Defendants' statements regarding the merit of the pending PDG lawsuit are not material because statements of opinion or belief are only actionable if accompanied by well-pleaded allegations that the speaker did not actually believe the statement at the time it was made.[118] Morever, Defendants argue that because such statements were forward-looking and accompanied by adequate warnings, they are safely within the PSLRA's statutory safe harbor.[119] Third, Defendants argue that any misrepresentations or omissions made by ADPI concerning ADPI's proposed business plan to continue operating the PDG clinics without PDG's dentists are not actionable because Plaintiffs have not alleged facts suggesting that Defendants knew that their conduct was wrongful or that, if Defendants did have such knowledge, Defendants had any duty to disclose it.[120]

A misrepresentation or omission is material "when there is a substantial likelihood that a reasonable investor would have viewed it as significantly alter[ing] the total mix of information made available."[121] Misrepresentations or omissions are "not actionable if the misrepresented fact

---

[116] Defs.' Mem. Law, Ex. 15, 14, 20–21 [#6].

[117] Defs.' Mem. Law, Ex. 15, 14, 20–21 [#6].

[118] Defs.' Mem. Law, 18 [#6].

[119] Defs.' Mem. Law, 21 [#6].

[120] Defs.' Mem. Law, Ex. 15, 24–25 [#6].

[121] City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., No. 10-1514, 2011 U.S. App. LEXIS 1065, at *12 (1st Cir., Jan. 20, 2011) (alteration in original) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988)) (internal quotation marks

is otherwise insignificant."[122]  Statements of opinion may be actionable if the plaintiff pleads facts suggesting that the speaker did not actually hold that opinion or believe his or her own statement.[123]  Additionally, after a corporation makes a disclosure to the public, "there is a duty to make it complete and accurate."[124]

The PSLRA's heightened pleading standards also apply.[125]  If a complaint is based on allegations of misrepresentation or omission, the complaint must, first, "specify each statement alleged to have been misleading."[126]  Second, the complaint must explain "the reason or reasons why the statement is misleading"[127] by providing some factual support for the allegations of fraud.[128]  Third, plaintiffs who base their claims on information and belief must set out the source of the information and the reasons for holding that belief.  In addition, the PSLRA contains a "safe harbor" provision that "shelters forward-looking statements that are accompanied by

---

omitted).

[122] Id. (citations and internal quotation marks omitted).

[123] Brown v. Credit Suisse First Boston LLC (In re Credit Suisse First Boston Corp.),431 F.3d 36, 47 (1st Cir. 2005), overruled on other grounds by ACA Fin., 512 F.3d 46.

[124] Roeder v. Alpha Indus. Inc., 814 F.2d 22, 26 (1st Cir. 1987) (citations omitted).

[125] The demands of the PSLRA have been reconciled with the First Circuit's traditional requirements for pleading fraud under Rule 9(b).  The First Circuit has held that the "PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999).

[126] 15 U.S.C. § 78u-4(b)(1); see Greebel, 194 F.3d at 193.

[127] 15 U.S.C. § 78u-4(b)(1).

[128] See Greebel, 194 F.3d at 193.

meaningful cautionary statements."[129]

Here, Plaintiffs have pled material misrepresentations or omissions with sufficient specificity to survive dismissal. Without addressing the materiality of all fifty-odd alleged misrepresentations or omissions in the face of Defendants' arguments, this court focuses its analysis on two of Defendants' public statements to which the arguments raised by Defendants do not apply.[130] In a press release dated February 6, 2006, ADPI stated, in reference to the PDG lawsuit, that "the Company conducts its business at Park Dental today as it has since entering into the affiliation with PDG nine years ago."[131] On a conference call on April 4, 2007, Serrao stated that there had been "no changes to the way ADPI had executed its obligations under the Service Agreement . . . and that ADPI would 'continue to operate [the] Park Dental business consistent with the service agreement and our past practices.'"[132]

These statements would have been misleading to investors. It may be plausible, based on all the allegations in the Complaint, that Defendants believed their conduct from 2002 to 2007 manifested an aggressive interpretation of, but not a breach of, the Service Agreement. But this court does not find it plausible, based on all the allegations in the Complaint, that Defendants did not know that APDI's conduct toward PDG had changed during this period, or that Defendants

---

[129] Id. at 201 (describing the safe harbor provided by 15 U.S.C. § 78u-5(c)(1)(A)(i)).

[130] Specifically, these misrepresentations do not express opinion or belief, but are plainly statements of fact. Likewise, the misrepresentations are not forward-looking and so do not fall within the PSLRA's safe harbor.

[131] Compl. ¶ 111 [#1].

[132] Compl. ¶ 131 [#1] (quoting Serrao).

did not know that their conduct altered practices put in place following the adoption of the Service Agreement by the Parties in 1996.  Such an inference would not be plausible because the Complaint alleges the direct involvement of Defendants in ADPI's changed execution of its obligations under the Service Agreement, whether or not these changes amounted to breaches of contract.[133]  After Defendants made a statement to the public regarding their conduct toward PDG, they had a duty to make that statement complete and accurate.  They did not do so.

Public statements to the effect that ADPI had not changed its conduct toward PDG at all would have been material to a reasonable investor because of the pendency of the PDG lawsuit. The PDG lawsuit threatened the relationship between ADPI and its largest client, one that provided APDI with thirty percent of its earnings and revenue.  ADPI's press releases, conference calls, and public filings throughout the relevant period demonstrate that the lawsuit was of great interest to investors and analysts.  Ultimately, the damages awarded to PDG amounted to a multiple of ADPI's annual profit.  Given the close scrutiny to which ADPI's conduct was subjected as the basis of the PDG lawsuit, Defendants' knowledge of and direct participation in this conduct, and Defendants' role in controlling the flow of information that reached investors, the statements would have altered the total mix of information available to a reasonable investor regarding ADPI's likelihood of prevailing in the PDG lawsuit— a matter that bore directly on the probable trajectory of ADPI's future share price as a reflection of its financial performance.

b.      Scienter

---

[133] See, e.g., Compl. ¶ 52 [#1] (alleging that Serrao personally decided to depart from past practice and no longer apply the budget retroactively); Compl. ¶ 56 [#1] (alleging that Feigh personally instructed ADPI employees to sweep the PDG account daily); Compl. ¶ 62 [#1] (alleging that Serrao personally instructed practice managers not to take direction from PDG dentists in clinical matters).

Defendants argue that the <u>Complaint</u> does not create a strong inference that Defendants made the challenged public statements because they intended to mislead investors.[134]  Rather, Defendants contend that, at most, the <u>Complaint</u> alleges that Defendants participated in corporate mismanagement that later caused the company to incur unintended liabilities.[135]

Scienter refers to "a mental state embracing intent to deceive, manipulate, or defraud."[136] The element of scienter can be established with a showing of "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."[137]  Alternatively, the element of scienter can be established "by showing that defendants acted with a high degree of recklessness."[138]  The issue is not "whether defendants had knowledge of certain undisclosed facts . . . , but whether defendants knew or should have known that their failure to disclose those facts present[ed] a danger of misleading buyers or sellers."[139] Such a danger must either be "known to the defendant" or "so obvious the actor must have been aware of it."[140]

---

[134] Defs.' Mem. Law, 21–26 [#6].

[135] Defs.' Mem. Law, 21–26 [#6].

[136] <u>ACA Fin.</u>, 512 F.3d at 58 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976)) (internal quotation marks omitted).

[137] <u>Ernst & Ernst</u>, 425 U.S. at 199.

[138] <u>City of Dearborn Heights</u>, 2011 U.S. App. LEXIS 1065, at *12 (quoting <u>Aldridge v. A.T. Cross Corp.</u>, 284 F.3d 72, 82 (1st Cir. 2002)) (internal quotation marks omitted).

[139] <u>Id.</u> at *16–17 (alteration in original) (quoting <u>Greebel</u>, 194 F.3d at 198) (internal quotation marks omitted).

[140] <u>Id.</u> at *12 (quoting <u>Greebel</u>, 194, F.3d at 198) (internal quotation marks omitted).

Under the PSLRA, a complaint must, with regard to each alleged misrepresentation, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[141]  But a court "should evaluate scienter with reference to the complaint as a whole, and competing inferences should be weighed against plaintiffs' preferred interpretation of the facts."[142]  An inference of scienter is considered "strong" if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[143]  If it so happens that the allegations give rise to equally strong inferences for and against scienter, a complaint should not be dismissed.[144]

Considering the <u>Complaint</u> as a whole, Plaintiffs have met their burden of stating with particularity facts giving rise to a cogent inference that Defendants either knew that the statements they made presented a danger of misleading buyers or sellers of ADPI stock, or that the danger of misleading investors was so obvious that Defendants must have been aware of it. ADPI was in the midst of a lawsuit with its largest client, PDG.  The lawsuit arose from changes in how ADPI executed its contractual duties to PDG under the terms of the Service Agreement, which PDG challenged as a breach of contract.  Plaintiffs have alleged numerous ways that ADPI changed its conduct under the Service Agreement, both in terms of the manner in which ADPI provided managerial and administrative support to PDG, as well as the manner in which ADPI accounted

---

[141] 15 U.S.C. § 78u-4(b)(2).

[142] <u>In re The First Marblehead Corp. Sec. Litig.</u>, 639 F. Supp. 2d 145, 163 (D. Mass. 2009) (Tauro, J.) (quoting <u>ACA Fin.</u>, 512 F.3d at 59) (internal quotation marks omitted).

[143] <u>Tellabs Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 324 (2007).

[144] <u>ACA Fin.</u>, 512 F.3d at 59 ("[W]here there are equally strong inferences for and against scienter, <u>Tellabs</u> now awards the draw to the plaintiff.").

for its income.[145]  Moreover, Plaintiffs have alleged the other Defendants' personal participation in

effecting these changes in conduct.[146]  Even if Defendants believed that ADPI's conduct did not

breach the Service Agreement, given the interest of investors and analysts in the outcome of the

PDG lawsuit and considering the unpredictability of litigation, Defendants must have known that

statements to the effect that ADPI had not changed its behavior toward PDG at all posed the

danger of misleading investors in such a way as to impede their attempts to predict ADPI's

likelihood of prevailing in the PDG lawsuit.  If Defendants did not know that their statements

posed a danger of misleading investors in this way, then they were highly reckless not to know

it—reckless enough to incur liability under the securities laws.  Looking at the allegations of the

Complaint as a whole, the inference that Defendants acted with intent to mislead investors, or that

they were reckless as to the likelihood of misleading investors, is at least as compelling as any

other inference that can be drawn from the facts alleged, including the inference that Defendants

were mere participants in corporate mismanagement.[147]

_____

[145] See supra Part II.A.

[146] Compl. ¶ 156 [#1] ("Defendants were active and culpable participants in the misconduct toward PDG that lies at the heart of the fraud perpetrated on ADPI's investors."); see also supra note 132 (citing specific allegations of Defendants' culpable involvement in the conduct at issue).

[147] Plaintiffs have suggested that the jury's finding in the PDG lawsuit, that ADPI acted "with deliberate disregard for the rights of PDG," Compl. ¶ 148 [#1], coupled with "additional facts," Pls.' Mem. Opp'n, 21 n.7 [#10], give rise to a strong inference of scienter, Pls.' Mem. Opp'n, 21 [#10].
Although a jury's "finding of willful infringement, by itself, is not sufficient to be res judicata on the issue of fraudulent intent," Rosenbaum Capital L.L.C. v. Boston Commc'ns Grp., Inc., 445 F. Supp. 2d 170, 175 n.2 (D. Mass. 2006), a jury finding of "willful infringement," coupled with the allegation of additional facts supporting an inference of fraudulent intent, has been found to raise the requisite "strong inference" of scienter, id.
Nevertheless, this court does not base its decision that Plaintiffs have met their pleading

c.    <u>Loss Causation</u>

Defendants argue that Plaintiffs have failed to adequately plead loss causation.[148]  First,

Defendants argue that the only alleged "corrective disclosure," the jury verdicts of December 12

and 13, 2007, simply represented the materialization of risks that the Parties had already

disclosed.[149]  Second, Defendants argue that if the jury finding accompanying the punitive

damages verdict of December 13, 2007—that ADPI had acted "with deliberate disregard for the

rights of PDG"—is the the court's only source of scienter, then during the relevant period

Plaintiffs were net sellers and could not have suffered a loss.[150]

The PSLRA imposes "ordinary"—not heightened—pleading requirements for loss

causation.[151]  A plaintiff must plead and prove that a defendant's misrepresentation, and not other

factors such as "changed economic circumstances, changed investor expectations, new

industry-specific or firm-specific facts, conditions, or other events,"[152] "caused the loss for which

the plaintiff seeks to recover damages."[153]  To do so, a plaintiff must "adequately allege and

_____

burden in regard to the element of scienter upon the jury's finding that ADPI acted with deliberate
disregard for the rights of PDG.

    [148] Defs.' Mem. Law, 21–26 [#6].

    [149] Defs.' Mem. Law, 26–28 [#6].

    [150] Defs.' Mem. Law, 30 [#6].

    [151] <u>See</u> <u>Dura</u>, 544 U.S. at 346 ("[W]e assume, at least for argument's sake, that neither the
Rules nor the [PSLRA] impose any special further requirement in respect to the pleading of
proximate causation or economic loss.").

    [152] <u>Id.</u> at 343.

    [153] 15 U.S.C. § 78u-4(b)(4).

prove" the "two traditional elements" of loss causation: (1) that a defendant's misrepresentation or other fraudulent conduct led to an "inflated purchase price" and (2) that a defendant's misrepresentation or other fraudulent conduct "proximately caused the plaintiff's economic loss."[154] The element of loss causation will be satisfied with a showing that a plaintiff purchased shares at a price inflated by a defendant's fraud and that the share price "fell significantly after the truth became known."[155] Although the "ordinary pleading rules are not meant to impose a great burden upon a plaintiff," a plaintiff's complaint must "provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests."[156]

Plaintiffs have met their burden for pleading loss causation. First, Plaintiffs have alleged that but for Defendants' material misrepresentations, which misled investors and analysts as to ADPI's conduct underlying the PDG lawsuit and ADPI's likelihood of prevailing in the lawsuit, Plaintiffs would not have bought and sold ADPI stock on the dates, at the prices, and in the numbers that they did.[157] Second, Plaintiffs have alleged that the compensatory and punitive damages verdicts of December 12 and 13, 2007 revealed the truth that caused the correction in the share price that led to Plaintiffs' loss.[158]

Defendants' argument that the jury verdicts of December 12 and 13, 2007 could not have

---

[154] Dura, 544 U.S. at 346.

[155] Id. at 347.

[156] Id. (citations and internal quotation marks omitted).

[157] Compl. ¶ 151 [#1].

[158] Compl. ¶ 154 [#1].

been loss causation events because the verdicts represented the materialization of risks that

Defendants had already disclosed fails because Defendants' disclosures were not complete and

accurate regarding the very risks at issue. Defendants' misrepresentations materially misled

investors and analysts in such a way as to impede assessments of the nature and gravity of the risk

to ADPI's share price posed by the PDG lawsuit—the very subject matter that Defendants argue

their disclosures addressed.

Defendants' argument that Plaintiffs were net sellers during the relevant period fails

because this court has not based its decision that Plaintiffs adequately pled scienter on the jury

finding that accompanied the punitive damages verdict of December 13, 2007.

In sum, Plaintiffs have adequately pled the two traditional elements of loss causation.

Functionally, Plaintiffs have provided Defendants with fair notice of what the claim is and the

grounds upon which it rests.

2.    Section 18

Defendants argue that Plaintiffs' claim under Section 18(a) should be dismissed as time-

barred.[159]  This court agrees.

Section 18(a) creates a cause of action for any person who buys or sells a security in

reliance on a materially false or misleading statement of fact in any application, report, or

document filed pursuant to the Exchange Act.[160]  An action under Section 18 must be "brought

within one year after the discovery of the facts constituting the cause of action and within three

---

[159] Defs.' Mem. Law, 31 [#6].

[160] 15 U.S.C. § 78r(a); <u>Lindner Dividend Fund, Inc. v. Ernst & Young</u>, 880 F. Supp. 49, 54–55 (D. Mass. 1995).

years after such cause of action accrued."[161]  Plaintiffs do not dispute that they failed to file their

Section 18(a) claim within one year after the discovery of the facts constituting the cause of

action.  Their claim is time-barred unless the statute of limitations has been tolled.

Plaintiffs invoke the "class action tolling" doctrine of American Pipe & Construction. Co.

v. Utah,[162] and cases following it,[163] to assert that the pendency of the ADPI class action tolled the

statute of limitations for their Section 18 claim.[164]  But appeal to the class action tolling doctrine is

unavailing to Plaintiffs in these circumstances.

Generally, class action tolling applies to any "of [a plaintiff's] claims which are part of a

class action against the same defendant[] until the class is decertified or [a plaintiff] opts out."[165]

But "[d]ifferent or peripheral claims . . . which do not concern the same evidence, memories, and

witnesses as the subject matter of the original class suit . . . cannot take advantage of American

---

[161] 15 U.S.C. § 78r(c).

[162] 414 U.S. 538, 554 (1974) (holding that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties" if class status is denied).

[163] See, e.g., Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 354 (1983) ("Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.  At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." (citations omitted)).

[164] Pls.' Mem. Opp'n, 25–31 [#10].

[165] Salkind v. Wang, No. 93-10912-WGY, 1995 U.S. Dist. LEXIS 4327, at *7 (D. Mass. Mar. 30, 1995) (citations omitted); see also Grispino v. New Eng. Mut. Life Ins. Co., 358 F.3d 16, 20 (1st Cir. 2004) (mentioning, in dicta, "a consistent line of federal circuit court cases holding that the American Pipe tolling doctrine applies to plaintiffs who opt out of a class action in federal district court" (citations omitted)).

<u>Pipe</u> tolling."[166]  The rule is intended to insure that limitations periods are tolled only for those claims as to which defendants were "fairly placed on notice" by the class action, so that potential defendants are not prejudiced by a plaintiff who slept on his or her rights.[167]

The legal standards for proving Section 18 and Section 10(b) claims are sufficiently distinct that filing a class action claim alleging a violation of Section 10(b) does not toll the statute of limitations for a Section 18 claim.[168]  Even when the two claims arise from the same alleged conduct, "the facts required to be pleaded and proved under section 10(b) are significantly different from the facts that give rise to section 18 claims."[169]  Among other differences, a Section 10(b) claim requires that a plaintiff prove that a defendant acted with scienter,[170] while under Section 18, the "state of mind with which the defendant acted enters the case instead as a defense."[171]

In this action, Plaintiffs bring a claim under Section 18(a), but the class complaint asserted only violations of Section 10(b) and Section 20(a).  Arguably, the class action put Defendants on

---

[166] <u>Salkind</u>, 1995 U.S. Dist. LEXIS 4327, at *7 (internal quotation marks omitted).

[167] <u>Crown, Cork & Seal Co.</u>, 462 U.S. at 355 (Powell, J., concurring).

[168] <u>See</u> <u>Lindner Dividend Fund</u>, 880 F. Supp. at 54–55 ("[B]ecause the 'legal standards for bringing an action under § 18 are significantly different from those for 10(b),' . . . the tolling doctrine of <u>American Pipe</u> does not apply to plaintiffs' claims.").

[169] <u>Id.</u> at 54–55.

[170] <u>See</u> <u>ACA Fin.</u>, 512 F.3d at 58.

[171] <u>Brody</u>, 414 F.3d at 193.  In a Section 18 action, a defendant can "rebut liability by proving 'that he acted in good faith and had no knowledge that such statement was false or misleading.'"  <u>Id.</u> (quoting 15 U.S.C. § 78r(a)).

notice that other securities claims might arise out of the challenged conduct. But because the legal standards for proving a violation of Section 18 differ significantly from those for proving a violation of Section 10(b), class action tolling does not apply and the Plaintiffs' Section 18 claim is dismissed as untimely.

### 3. Section 20(a)

Defendants argue that this court should dismiss the claim under Section 20(a) because there is no underlying violation of the securities laws.[172] This court does not agree.

Section 20(a) of the Exchange Act creates "a cause of action against any individual who exerts direct or indirect control over a corporation that acts in violation of the securities laws."[173] Section 20(a) asserts "joint and several liability" against those who exercise control over the violating entity.[174] To state a claim under Section 20(a), plaintiffs "must allege and prove: (1) an underlying violation by a controlled person or entity; (2) the defendants control the violator; and (3) the defendants are in a meaningful sense culpable participants in the fraud in question."[175]

---

[172] Defs.' Mem. Law, 34 [#6].

[173] In re Parametric Tech. Corp. Sec. Litig., 300 F. Supp. 2d 206, 223 (D. Mass. 2001) (citing 15 U.S.C. § 78t(a)).

[174] 15 U.S.C. § 78t(a).

[175] Although the First Circuit has recognized a split among the circuit courts as to whether "an element of section 20(a) liability is 'culpable participation,'" the First Circuit has not decided the issue. Aldridge, 284 F.3d at 85. For the purposes of analyzing this Motion to Dismiss only, this court adopts the more stringent test.

Defendants have challenged only the first element: an underlying violation of the securities laws by the controlled entity.[176]  Defendants' argument for dismissal of this claim is predicated on this court's dismissal of the Section 10(b) and Rule 10b-5 claim.[177]  Because this court declines to allow the Motion to Dismiss as to the claim under Section 10(b) and Rule 10b-5, dismissal of the Section 20(a) claim for failure to plead an underlying violation by the controlled entity would be improper at this time.

IV.     Conclusion

For the foregoing reasons, the Motion to Dismiss [#5] is DENIED as to the Section 10(b) and Section 20(a) claims but ALLOWED as to the Section 18 claim.

AN ORDER HAS ISSUED.


_____/s/ Joseph L. Tauro_____
United States District Judge

---

[176] Defs.' Mem. Law, 34 [#6].

[177] Defs.' Mem. Law, 34 [#6].